THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DEBORAH FAY BOLDEN, Defendant-Appellant.

Fourth District No. 4—84—0432

Opinion filed May 6, 1985.—Rehearing denied June 4, 1985.

Daniel D. Yuhas and Judith N. Kirby, both of State Appellate Defender's Office, of Springfield, for appellant.

J. William Roberts, State's Attorney, of Springfield (Robert J. Biderman and David E. Mannchen, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE WEBBER delivered the opinion of the court:

A jury in the circuit court of Sangamon County convicted the defendant of the offense of murder in violation of section 9—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)). The court sentenced her to a term of 22 years of imprisonment.

Defendant was originally charged by information with three counts of murder and one count of voluntary manslaughter. Prior to trial the State moved to dismiss the manslaughter count and to add two additional counts of murder to the charges. There was no objection by the defendant to the dismissal of the manslaughter charge; she did object to the filing of additional counts of murder. The original murder counts were the customary ones, charging intent, knowledge, and strong probability; the additional counts alleged intent to do great bodily harm and felony murder (aggravated battery). The trial court allowed the dismissal of the manslaughter charge, sustained the objections to the felony murder count, and overruled the objections to the great bodily harm count.

Since the defendant has raised an issue of reasonable doubt together with a related issue of improper jury instructions on manslaughter as an included offense, it will be necessary to enter into a recital of the facts as they were developed at trial.

In broad outline the evidence showed that the defendant Debbie Bolden, the victim Rose Hayes, and two men, Willie Hunter and August Johnson, were together at Hayes' residence during the early morning hours of January 26, 1984. Inside the house the defendant and the victim quarreled and exchanged words and blows. The defendant left the house and was followed by Hayes. The fight contin-

ued outside the house, where the defendant stabbed Hayes, who died within a few minutes of her wounds. Defendant claimed self-defense.

Willie Hunter testified that he drove his white Cadillac to Big John's Social Club in Springfield in the early morning hours of January 26, 1984. While there he danced with Rose Hayes and offered to drive her to her home. The club closed at approximately 4:30 to 5 a.m. In response to their requests, Hunter also gave the defendant, August Johnson, Alice Bailey, and two others a ride to their homes. Hunter testified that the defendant "was with Augie Johnson that night." During the ride in the car, the victim and the defendant began to argue and call each other "bitches and *** different names." However, Hunter thought that they were only "joking." Hunter eventually dropped off Alice Bailey and the two others. At this point, Hayes invited Hunter, Johnson, and the defendant to her house. When they arrived at Hayes' house, Hunter, Johnson, and Hayes moved her three children from the living room, where they had been sleeping, into a second-story bedroom. The four adults then listened to music, danced, and consumed alcoholic beverages. Hunter was dancing with Hayes. Later he "went upstairs to use the bathroom." When he returned he saw Hayes and August Johnson sitting on a couch in the first floor spare bedroom. Hunter sat down with them, and the defendant entered the room. Defendant then slapped Hayes "pretty hard." Hayes "got mad and jumped up." Johnson grabbed the defendant and Hunter grabbed Hayes in order to prevent them from fighting.

Hunter stated that he did not know why the women were fighting, since he had been upstairs when the fight started. He recalled that the defendant said, "You slapped me," and Hayes responded, "I didn't slap you that hard." The defendant prepared to leave the house, and Hayes followed her to the front door, where she "lit into" the defendant. The defendant backed out of the door and onto the porch, where Hayes followed her, still fighting. At this point, Hunter testified that Johnson said to him, "Damn, let me get this knife from this bitch." Hunter and Johnson then started toward the door. When they reached the porch Hayes was staggering back to the porch, and she fell against the porch stairs railing. Hunter caught her as she slumped to the floor of the porch. Hunter stated that he did not see what had happened between the two women and that he had never seen a knife used. He stated that the women had been outside 30 to 40 seconds before he and Johnson followed them. It was also dark at the time.

Hunter stated that when he first went out on the porch the defendant was standing on the sidewalk that led from the porch and

that she was "in hysterics." Hunter then went to his car and pulled it up next to the porch in order to take Hayes to the hospital. When they pulled her into the light, Hunter noticed that she was bleeding from the face. He checked her pulse and found it to be slight. He instructed Johnson to go "next door and have them call an ambulance."

Hunter did not notice when the defendant had left the scene. He stated that Johnson may have yelled something to her at one time.

Johnson did ask the victim's neighbors to call an ambulance. Hunter testified that the neighbor came over to the porch for a few minutes. Hayes' 11-year-old son came out on the porch at this time, too. Hunter told Johnson that the victim was dead, and Johnson said, "We're all going to catch a murder beef." At this point Hunter and Johnson left in Hunter's car. They found the defendant walking down a nearby street. Hunter saw nothing in her hands as she got into the car. He testified that defendant said, "She got what she deserved."

Frank Hayes, the 11-year-old son, testified that two men and one woman arrived at his house along with his mother at 5:23 a.m. on January 26, 1984. After he and his brother and sister were moved to an upstairs bedroom, he heard an argument. Looking out the bedroom window he observed his mother and a lady with "their fists up" standing on the sidewalk near the front porch. He heard his mother say, "I'm too old to fight" and "Do you want some more?" He later lost sight of the women as they moved toward the front porch. He then heard noises which sounded like jumping or fighting on the porch. He went downstairs to see what was going on and saw his mother lying on the porch. He saw a man standing by a car on the side of the house, and his neighbor, Amy Johnson, later came to the house.

Amy Johnson, a 14-year-old neighbor, was awakened by a barking dog at approximately 6 a.m. on January 26, 1984. She went to the window in the front of her house, where she observed a man holding a lady "against the porch." This lady was not Rose Hayes. The man then released the woman and she left the house, walking down the street. The man then yelled, "Deborah, bring your funky ass back here." However, she continued walking. The man then came over to her house and asked her to call an ambulance. She went to the Hayes home, saw the victim lying on the porch, and returned and called an ambulance. When she returned to the Hayes home, the men had left. She put a sheet over the victim.

Wilbur Saylor testified that he found a blood-stained knife on the morning of January 26, 1984, as he walked to his place of employment. The knife was on a sidewalk in the neighborhood where Saylor

had heard that the murder, herein, had occurred.

Alice Bailey's testimony substantially corroborated that of Willie Hunter as to the events which occurred after Big John's Social Club had closed and before she left Hunter's car. She stated that she heard Hunter and August Johnson talking about "going to bed" with Hayes. She testified that Hayes then laughed and told Johnson that he looked "like a 16-year-old schoolboy." The defendant then responded, "Don't nobody talk to my man like that but me." Bailey, however, believed that the women were just "kidding around."

Dr. Grant Johnson, a pathologist at Memorial Medical Center in Springfield, testified that he was called to the victim's residence at 6:45 a.m. on January 26, 1984. Upon his arrival he observed a body on the front porch, "obviously dead." After photographing the scene, he transported the body to Memorial Medical Center and performed an autopsy. Upon examining the body, he observed three major defects or wounds to the victim's nose, abdomen, and right arm. There was also a bruise on the lower right jaw. The cause of death was determined to have been a massive hemorrhage in the abdominal cavity due to a stab wound which had perforated the right iliac artery and the inferior vena cava.

Dr. Johnson described the nose wound as a "deep wound * * * which went through the bony structure of the nose and entered the nasal cavities." The victim also had a "small, slit-like wound" on her right upper arm. The wound to the abdomen, resulting in the severing of a major artery and vein, would have caused death in "probably not more than a minute." Dr. Johnson felt that the victim could have continued to swing her arms after she had been stabbed in the abdomen, but was unsure as to whether or how far she could have walked after receiving the wound.

Detective Charles Pennell of the Springfield police department testified that he interviewed the defendant on February 2, 1984. She gave three statements to Pennell. In the first statement she stated that an unknown man in a white car dropped her and August Johnson off near her sister's home after Big John's Social Club had closed. She stated that she learned of the murder through the newspaper.

In her second statement to Pennell, the defendant stated that she and Johnson left Big John's in a white car being driven by a man she identified as Willie Hunter. She said that they were also accompanied by Irva Burrows, her niece. She stated that they were dropped off near her sister's home. Since her sister was not home they stayed at Burrow's residence. Defendant denied that she had gone to the victim's house on that night. She stated that she did not own a knife and

that she did not have an argument with the victim.

In her third statement she stated that she and Johnson, along with Hayes, Alice Bailey, Irva Burrows, and Irva's boyfriend, were all given rides home by Willie Hunter after Big John's closed. After the others were dropped off, Hayes invited Hunter, Johnson, and the defendant to her home. While there, she was slapped by Hayes. She stated that Hayes followed her to the porch and continued to slap and beat her until defendant stabbed her in the stomach. She then left the house and was picked up later by Johnson and Hunter. She stated that she threw the knife out of Hunter's car.

Detective Dwayne Jones was also present when defendant was interviewed on February 2, 1984. He corroborated Pennell's testimony and added that the defendant never claimed that she feared for her life and never described any injuries that she might have received from Hayes.

August Johnson then testified on behalf of the defendant. He substantially corroborated the testimony of Willie Hunter and Alice Bailey as to the events that occurred after Big John's had closed and before they reached the victim's house. He stated that Hayes and defendant were "calling each other names" and "kidding around" in the car. However, he denied that he had talked about "sleeping with" Hayes, and he denied that Hayes said that he looked like a 16-year-old schoolboy.

Johnson testified that Hayes invited Hunter, the defendant, and him to her house. Once there, they moved her children to an upstairs bedroom. They then continued to drink, dance, and listen to the stereo. After dancing for a time, the defendant and Johnson sat on a couch and the defendant fell asleep. Johnson asked Hunter to drive them home, but Hunter wished to stay there all night. Hayes then began to prepare her first-floor spare bedroom for Johnson and the defendant to sleep in. At this point Hunter went upstairs to use the bathroom. Johnson testified that Hayes went over to the defendant and slapped her twice, saying, "Bitch, get up." The defendant then "kind of woke up" and Hayes and Johnson went back to the spare bedroom, where they were joined by Hunter. The defendant then entered the bedroom and slapped Hayes, who became angered by how hard she had been slapped. Johnson stated that the defendant said she didn't feel like fighting and started to walk out the front door. Hayes then broke loose from Hunter's grasp saying, "I'm going to kill this bitch." She followed the defendant to the front porch "and jumped on her." Johnson said he saw them the entire time and that they never left the porch. However, he did state that he left to get his

coat at one point. When he looked out of the front door he saw Hayes turn around and noticed blood coming from her face. She was still swinging her arms. He and Hunter then went onto the porch. Hunter grabbed Hayes as she fell. The defendant then left the porch and walked away. Johnson went to a neighbor's house and asked that an ambulance be called. He and Hunter then left in Hunter's car, and they picked up the defendant two or three blocks away.

Johnson denied that he had called to the defendant from the front porch as she walked away. He further stated that neither woman left the porch prior to the stabbing. He also denied that he ever knew that the defendant had a knife or that he had stated to Hunter that they should take the knife from her. He stated that he never saw a knife in the defendant's hand when they picked her up after the stabbing. Finally, he testified that the defendant never said that Hayes got what she deserved.

Johnson admitted that the defendant was his girlfriend and that he had lived with her prior to her arrest. Johnson's testimony was impeached by prior inconsistent statements that he had made to the police. He stated that he didn't tell the police the truth because he feared that he would be charged with murder. Johnson was further impeached with two prior forgery convictions and one prior aggravated battery conviction.

The defendant testified in her own behalf. She stated that she remembered being awakened on the couch at Hayes' house by a hard slap to her face. She heard her say, "Wake up, bitch." She then slapped Hayes back. As Hayes started to "swing" at her again, Johnson and Hunter broke up the fight. Defendant then started to leave the house, and she heard Hayes say, "I'm going to kill this bitch." Hayes then ran out the door and grabbed defendant and started "beating" her. Defendant testified that she thought she was trying to kill her. Therefore, she pulled out her knife, opened it up and "stuck" Hayes in the face. Since Hayes was "still swinging" she stabbed her in the stomach too. Hayes then backed away. Defendant stated that she never left the porch before stabbing Hayes. After the stabbing, the defendant stood on the porch as Hunter held Hayes. She then walked away. She was later picked up by Hunter and Johnson, and she threw her knife out of the car. She identified the knife found by Wilbur Saylor as the one with which she had stabbed Hayes.

Defendant was impeached by her prior inconsistent statements to the police. She stated that she had never told the police that she thought Hayes was trying to kill her because they had never asked her. She admitted that she had lied to the police in the first two state-

ments that she had given them. She admitted that even in her third statement she did not tell the police that Hayes had said, "I'm going to kill this bitch." She stated that she did not tell the police that she had suffered any injuries, as a result of being beaten by Hayes, when she was interviewed on February 2, 1984. Defendant stated that she had owned her knife since the summer before the slaying and that she always carried it with her.

In rebuttal, Detective Pennell testified that he interviewed August Johnson on February 2, 1984. Johnson stated then that he had left Big John's on the night of January 26, 1984, in a blue Chevrolet at approximately 3 a.m. In a second statement he stated that he left with Willie Hunter in a white Cadillac. However, he denied that they ever went to Hayes' house. Pennell stated that he had again spoken with Johnson on April 30, 1984. At that time Johnson told Pennell that he had lied earlier to protect the defendant. Pennell stated that Johnson was never a suspect in this slaying. Pennell said that he had read a statement that Johnson had given to defendant's counsel. When Pennell asked Johnson if that statement was correct, Johnson said that he did want to change the statement to include the fact that Hayes stated, "I'm going to kill the bitch."

■ Defendant's principal issue is that she was not proved guilty of murder beyond a reasonable doubt and that her conviction should be reduced to the offense of voluntary manslaughter, on which the jury was instructed as an included offense, but which it rejected. A reasonably complete treatment of the matter requires an excursus into the history and evolution of the respective offenses.

Prior to the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1983, ch. 38, par. 1—1 et seq.), Illinois followed the common law definitions of murder and manslaughter. Murder was defined as: "[T]he unlawful killing of a human being, in the peace of the people, with malice aforethought, either expressed or implied." (Ill. Rev. Stat. 1959, ch. 38, par. 358.) Manslaughter was defined as: "[T]he unlawful killing of a human being without malice, express or implied, and without any mixture of deliberation whatever." (Ill. Rev. Stat. 1959, ch. 38, par. 361.) The statute went on to attach conditions in order to make a distinction between voluntary and involuntary manslaughter. In order to make out a case of the former, "[t]he killing must be the result of that sudden, violent impulse of passion supposed to be irresistible." Ill. Rev. Stat. 1959, ch. 38, par. 362.

The drafters of the Code elected to avoid the "malice" distinction between the offenses. (See Ill. Ann. Stat., ch. 38, par. 9—1, Committee Comments, at 17 (Smith-Hurd 1979).) Instead, the drafters used

the terms "intends" or "knows," or "intentionally or knowingly." Murder is now defined as:

> "A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:
>
> (1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(1).)

One species of voluntary manslaughter is now defined as:

> "A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation ***." Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a).

These definitions have led to some heated academic commentary. (See O'Neill, *"Murder Least Foul": A Proposal to Abolish Voluntary Manslaughter in Illinois*, 72 Ill. B.J. 306 (1984); Haddad, *Allocation of Burdens in Murder-Voluntary Manslaughter Cases: An Affirmative Defense Approach*, 59 Chi.-Kent L. Rev. 23 (1982).) Part of Professor O'Neill's argument is that by eliminating the term "malice" the drafters redefined criminal homicide in such a way that murder and manslaughter are no longer discrete offenses. Professor Haddad suggests that murder is now an included offense of voluntary manslaughter. We take a somewhat different approach.

Since the term "malice" is of ancient vintage, recourse to older authority is indicated as a proper approach. Under that authority we find that "malice" and "intent" are in law the same. For example:

> " " "Malice," in its legal sense, differs from the meaning which it bears in common speech. In common acceptation it signifies ill will, hatred, or revenge toward a particular individual. Such a condition of mind would, of course, constitute malice in the eye of the law, but such is not necessarily its legal sense. "Malice," in its legal sense, denotes that condition of mind which is manifested by the intentionally doing of a wrongful act without just cause or excuse. It means any willful or corrupt intention of the mind.' " (*Pembrook v. State* (1929), 117 Neb. 759, 763, 222 N.W. 956, 957.)

And further:

> "The distinction between murder and manslaughter, therefore, is that in the former the element of malice aforethought enters, while it is wanting in the latter. The malice necessary to the crime of murder cannot co-exist with the heat of passion.

'There can be no such thing in law as a killing with malice, and also upon the furor brevis of passion; and provocation furnishes no extenuation, unless it produces passion. Malice excludes passion. Passion presupposes the absence of malice. In law, they cannot co-exist.' (*State v. Johnson*, 23 N.C. (1 Iredell's Law) 354, S.C. 35 Am. Dec. 742; 2 Bish. Cr. Law, sec. 697.) The act of killing cannot be prompted by both. The heat of passion necessary to reduce the killing to manslaughter must be irresistible, as is sometimes said, and the killing must proceed from it. But the existence of such passion, aroused by adequate provocation, rebuts the idea that the act is the result of malice." *State v. Sloan* (1899), 22 Mont. 293, 302, 56 P. 364, 367.

Thus, even though the drafters of the 1961 Code used "intent" rather than "malice," the end result is essentially the same and the change in language is more cosmetic than real. Murder requires a mental state of intent or knowledge; voluntary manslaughter requires a mental state of passion ("furor brevis" in *Sloan*). This is not one of the four mental states set forth in section 4—3(a) of the Code (Ill. Rev. Stat. 1983, ch. 38, par. 4—3(a)). One of these four mental states must be a basic ingredient of each offense under the Code. We therefore conclude that passion does not negate intent or knowledge, as in *Sloan*, but under the modern Code reduces them to a less culpable degree. Since passion is nowhere else mentioned in the Code in connection with the mental states of the various offenses, we conclude that it is unique to the one species of voluntary manslaughter.

It has been argued that voluntary manslaughter requires proof of more facts than murder (O'Neill, "murder plus extenuating circumstances"; Haddad, "passion-provocation or imperfect justification") and thus cannot under the statutory definition of included offenses be an included offense of murder. Such has never been held by a reviewing court since the enactment of the Code.

The theory ignores the full text of the statute, which is:

" 'Included offense' means an offense which

(a) Is established by proof of the same or less than all of the facts *or a less culpable mental state* (or both), than that which is required to establish the commission of the offense charged." (Emphasis added.) Ill. Rev. Stat. 1983, ch. 38, par. 2—9.

As we have just indicated, in our opinion passion reduces intent and knowledge to a less culpable degree and thus will require the adduction of additional facts, but this has a specific statutory fiat. The proof of mental state differs qualitatively from, for example, the proof of the presence of a dangerous weapon to enhance robbery to armed

robbery. Admittedly, there appears to be a certain lack of logical symmetry when *more* is required to prove *less*, but we would point out that it required the great British mathematician, Lord Bertram Russell, more than 300 pages to prove that one plus one equals two.

In our opinion, voluntary manslaughter of the sudden and intense passion variety is an included offense of murder. However, the inquiry may not end at this point, because the drafters of the Code included another variety of voluntary manslaughter which had not theretofore been found in the statute, namely, what now may be called the unreasonable-belief variety. This is contained in subsection (b) of the Code:

> "A person who intentionally and knowingly kills an individual commits voluntary manslaughter if at the time of the killing be believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable."

Ill. Rev. Stat. 1983, ch. 38, par. 9—2(b).

We first note that the supreme court has recently held specifically that this variety of manslaughter is an included offense of murder. (*People v. Hoffer* (1985), 106 Ill. 2d 186.) The rationale of that decision appears to be that while the statute specifically calls for a mental state of intent and knowledge, it is mitigated by an unreasonable belief in the necessity of self-defense. It is then parallel to the intense-passion species of voluntary manslaughter, where the mental state of intent and knowledge is mitigated by passion.

It will be noted that the unreasonable-belief species of voluntary manslaughter bears a close relationship to the affirmative defense of self-defense. (*People v. Lockett* (1980), 82 Ill. 2d 546, 413 N.E.2d 378; *People v. O'Neal* (1984), 104 Ill. 2d 399, 472 N.E.2d 441.) These cases suggest that the jury should be instructed on both self-defense and voluntary manslaughter. However, that occasion would arise only when the defendant has raised the affirmative defense of self-defense. It is equally possible that a defendant might waive any question of reasonable belief in self-defense leading to exoneration, and instead claim only unreasonable belief leading to mitigation and a voluntary manslaughter conviction.

Thus, no more operative facts need be examined or proved in an unreasonable-belief voluntary manslaughter case than in a murder case with self-defense. As with the intense-passion species of voluntary manslaughter, the principal inquiry is into the defendant's state of mind.

It remains to be decided how the question should be handled at trial, especially with reference to jury instructions and allocation of

burden of proof. We agree with Professor Haddad that the matter is best disposed of as a partial affirmative defense. Self-defense is a complete affirmative defense under the Code; either intense-passion or unreasonable-belief voluntary manslaughter should be treated as a partial affirmative defense.

In *People v. March* (1981), 95 Ill. App. 3d 46, 419 N.E.2d 1212, it was intimated that no case had been found in which the State was required to negate the elements of voluntary manslaughter in a murder case.

■ We hold today that when the defendant in a murder trial introduces some evidence of intense passion or of unreasonable belief, it is to be treated as a partial affirmative defense and the burden is on the State to negate the elements which would lead to a verdict of voluntary manslaughter. To the extent that *March* appears inapposite, it will no longer be followed. We suggest that the existing jury instructions are not adequate and that the trial courts and counsel should instruct juries in conformity with the views expressed in *Hoffer*. We believe that Professor O'Neill's urging of misnomer in this area has merit, but it must be addressed to the legislature.

■ We turn at last to the instant case and find that although the State was not required to do so at the time of this trial, it did in fact meet the burden of negating the elements of voluntary manslaughter. It will be remembered that the defendant here pleaded self-defense and the jury was instructed on unreasonable-belief voluntary manslaughter as an included offense.

The evidence at trial showed that, while the victim was the aggressor at one point, defendant had also struck the victim. Defendant had no reason to believe that the victim was armed and, indeed, she has never contended as much. Furthermore, Frank Hayes testified that he observed the two women standing apart on the sidewalk in front of the house prior to the stabbing. Willie Hunter testified that he observed the victim staggering up the porch steps suffering from stab wounds. This testimony suggests that the defendant could have left at this point, but instead chose to stab the victim. Defendant's testimony that she pulled her knife out of her pants' pocket and opened it during the course of a beating seems incredible. It is also unbelievable that the victim would have constituted a threat to the defendant once the defendant had inflicted the deep and certainly painful wound to the victim's nose. Moreover, when she inflicted the fatal wound, the defendant admittedly knew that she had just stabbed an unarmed woman in the face.

More importantly, the defendant never told the police that she

feared for her life or that the victim had threatened to kill her. Nor did she claim that she had been injured by the alleged beating that she had received when she spoke to the police a few days later. Indeed the police observed no injuries at that time. Presumably, these would have been important facts to someone trying to justify a murder to the police. While August Johnson testified that he, too, heard the victim threaten defendant's life, his testimony is also highly suspect. He, too, did not mention until the trial that the victim had threatened to kill the defendant. Moreover, Detective Pennell testified that Johnson stated that he had previously lied to the police to protect the defendant, his girlfriend. Furthermore, the testimony of both Johnson and the defendant conflicted substantially with the prosecution witnesses' testimony.

Under these circumstances, the jury exercised its option not to accept the defendant's self-serving testimony that she feared for her life when she stabbed the victim in the abdomen. Instead, the jury properly considered the improbability of defendant's testimony, the circumstances of the offense, and the testimony of other witnesses in concluding that she was guilty of murder.

■ Defendant argues that the jury was confused. In the course of deliberations it sent a note to the trial judge inquiring, "If the jury finds the defendant guilty of murder, must they also find the defendant guilty of voluntary manslaughter and then sign both forms stating a guilty verdict?" The court responded that in the event the jury found the defendant guilty of murder, it might, but need not, return a verdict on voluntary manslaughter. Under the rule of *Hoffer* the court's statement was erroneous, since the mental states for murder and voluntary manslaughter are mutually exclusive. However, the error was harmless, since the jury obviously considered both and returned only a single verdict, unlike the *Hoffer* jury.

■ The remaining issues may be dealt with somewhat more summarily. Defendant claims that she was denied the effective assistance of counsel since her counsel also represented August Johnson, a defense witness, in an unrelated matter. Counsel so advised the trial court and stated that he did not believe that any conflict existed. The trial court acknowledged that Johnson might be impeached because of the representation, but considered such impeachment to have "very marginal relevance."

Defendant does not claim *per se* conflict of interest; therefore, she is required to show actual conflict and to show prejudice. She points to nothing to sustain this burden but only speculates that the possibility that Johnson might have been impeached served to prejudice her

defense. We will not disturb a conviction on the basis of speculative or conjectural conflicts of interest which are envisioned for the first time on appeal. *People v. Hancock* (1978), 65 Ill. App. 3d 694, 382 N.E.2d 677.

██ Finally, defendant contends that the prosecutor used improper closing argument. We first note that no objections were lodged to most of the remarks now complained of, nor were they included in defendant's post-trial motion. The objection therefore has been waived in all such areas. *People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091; *People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739.

Defendant did object to one remark and claims now that the prosecutor suborned perjury:

> "Ladies and gentlemen, I did not call Augie Johnson to the stand to testify to you because I would not be the one to put that type of testimony before this Jury."

Defendant now argues that the implication was that defense counsel called Johnson knowing that he would lie.

██ We find the inference far-fetched. Prosecutors are not well known for presenting to juries witnesses obviously favorable to the defense. Furthermore, the remark was in response to a part of defense counsel's closing argument, wherein he said:

> "Now, August Johnson took the stand as an eyewitness. The State didn't call him. I had to call him."

A defendant cannot complain about a remark which was invited by defense counsel. *People v. Dixon* (1982), 91 Ill. 2d 346, 438 N.E.2d 180; *People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671.

Accordingly, the judgment of the circuit court of Sangamon County is affirmed.

*Affirmed.*

GREEN, P.J., and MILLS, J., concur.