THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIE FRANK McVAY, JR., Defendant-Appellant.

Fourth District   No. 4—87—0476

Opinion filed May 19, 1988.

Daniel D. Yuhas and Judith L. Libby, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and J. A. C. Knuppel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

The Champaign County grand jury indicted the defendant, Willie Frank McVay, Jr., for the stabbing death of his wife in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2)). After a bench trial, defendant was found guilty of murder and was sentenced to a term of 30 years' imprisonment. The issues on appeal are: (1) whether defendant's murder conviction should be reduced to voluntary manslaughter because the State failed to prove beyond a reasonable doubt the homicide was not the result of sudden and intense passion; and (2) whether defendant was denied effective assistance of counsel. We affirm.

Since defendant has raised an issue of reasonable doubt it is nec-

essary to present a detailed recitation of the facts.

On the morning of February 8, 1987, defendant went to the house of his longtime friend, Lawrence Armour, to do odd jobs. That day there was no work to be done, but defendant remained at the house to talk and drink. Around noon decedent came to Armour's house to talk briefly with her husband. Later defendant told Armour he wanted to move out of decedent's house. Defendant indicated that if Armour did not find him a place to stay "something was going to happen." At approximately 6 or 7 p.m. defendant went home.

Around 7 p.m. two high school students saw a car, later identified as defendant's, hit the guardrails on the I-72 overpass at Duncan Road before it hopped the guardrail and landed in a ditch. Defendant and decedent were the only occupants of the car. Decedent was found face down on the floorboard of the backseat. Her shirt was wrapped around her head, she was covered with blood and appeared to be dead. Defendant, while drifting in and out of consciousness, made several inquiries about his wife. There was no broken glass at the scene of the accident.

The police who searched the McVay residence reported that the kitchen and living room were in disarray and covered with blood. A pot of beans was apparently thrown on the living room couch. The lights, television set, VCR and a burner on the stove were turned on. A broken kitchen knife blade was found on the kitchen floor and a serrated knife was lying on the counter.

Defendant gave the police two different stories explaining that his wife was stabbed by home invaders while he was in the bathroom. Finally, defendant admitted he had stabbed decedent after she threw a pot of beans at him and attacked him with two knives. Defendant said he was taking her to the hospital when the car accident occurred.

At trial defendant testified he arrived home on February 8 later than expected because he had car trouble at Armour's house. He said he kissed his wife and she asked if he wanted dinner. He got a beer and went to the living room to watch TV. Defendant said decedent did not seem angry at that time. However, while defendant was watching TV, decedent came out of the kitchen with a pot of beans and threw it at defendant. Defendant avoided being hit by the pot and asked her what was wrong. Decedent said she was tired of him staying out all night. Defendant testified decedent went back to the kitchen and returned swinging a knife at him. Defendant said she cut him on the upper left arm and forearm and stabbed him in the stomach. Defendant displayed his stomach wound to the court.

Defendant said he grabbed the knife by the blade to defend himself and cut his left hand and broke the knife blade in the process. He threw the knife blade on the living room floor.

Next, decedent went back to the kitchen, armed herself with a long, serrated knife and swung the knife at defendant wildly. Defendant remembered taking the knife away from her but could not recall cutting or stabbing her. Defendant said the next thing he realized he was lying on top of decedent on the kitchen floor and she was bleeding. Defendant did not call an ambulance but decided to take decedent to a hospital himself.

Defendant explained he initially lied to the police because he was still sedated from the drugs that were administered at the hospital and he was afraid the police would not believe decedent attacked him with the knives. Defendant insisted he had no reason to kill his wife. He and decedent did not ever have physical confrontations. When they were having marital difficulties defendant would move out for awhile.

Kathy Gilliland, the emergency room nurse who treated defendant, testified on rebuttal for the State. She denied that defendant had a stomach wound when she first checked his body. However, she observed a doctor make an incision and insert a catheter into defendant's abdomen as part of a standard procedure for trauma patients. The only other injuries she noted were some superficial abrasions on defendant's left arm and shallow wounds on the fingers of his right hand. These wounds did not require dressings and there was no active bleeding.

Dr. Yue T. Ho, the pathologist who performed the autopsy on decedent's body, testified decedent was stabbed 66 times on her face, neck, trunk and extremities. He measured the length, width and depth of each wound to determine its source. Dr. Ho described several wounds with irregular margins which he said were inflicted by an irregularly edged object like the serrated knife that was found in the McVay house. The wounds with clean-cut margins were inflicted by an object with a sharp, straightedge like the broken knife blade also found at the McVays'. Dr. Ho did not compare the knives recovered from the house with the wounds inflicted on decedent's body. The doctor insisted he was certain the wounds on decedent's body were made with more than one knife. He denied that a serrated knife could make a wound with a clean-cut margin but he had not performed any tests to support his conclusion.

At the close of the State's rebuttal evidence, defendant was allowed to reopen his case and introduce into evidence an article on

edged weapons to refute Dr. Ho's two-knife theory. Nonetheless, the trial judge found the State rebutted defendant's partial affirmative defense of voluntary manslaughter. The judge admitted that defendant's explanation for the murder, if true or believed, would raise a reasonable doubt as to whether defendant killed his wife without provocation. However, the judge concluded defendant's version of the exchange between him and decedent was false. Decedent did not attack defendant with a knife and therefore did not provoke defendant to stab her to death.

In deciding whether the State negated defendant's defense of voluntary manslaughter the trial court did not find the following factors determinative: (1) the defendant's conduct after the stabbing—the court believed defendant intended to take decedent to the hospital rather than dispose of her body; (2) the fact the broken knife blade was found in the kitchen rather than in the living room where defendant said he broke it; (3) the inconsistency of the location of blood in the living room with defendant's version of the event; and (4) the fabricated stories defendant initially told the police.

The court declared:

> "None of these things in and of themselves would be sufficient in my mind to overcome his defense or at least his attempt to reduce the charge to voluntary manslaughter beyond a reasonable doubt.
>
> What I have found to be determinative after a great deal of consideration is the testimony of Dr. Ho and Mrs. Gilliland. Dr. Ho testified without hesitation and without equivocation and under extensive, intensive, and very skillful cross examination that he observed some wounds that were irregular in configuration and some that were, as he described them, I believe, clean cuts or smooth, and he insisted that both of these kinds of wounds could not have been caused by the same knife or same weapon. He insisted that in his experience the jagged edged knife, \*\*\* would not have inflicted those even cuts that he observed, and particularly, the two that proved ultimately fatal.
>
> \* \* \*
>
> Now, Dr. Ho's testimony, of course, destroys Mr. McVay's version of what happened, because Mr. McVay insists that he was attacked with \*\*\* the smooth edged blade, that he caught it in his hand and he snapped it off, and that then his wife went to the kitchen, obtained a jagged blade knife and attacked him with that. It was that weapon with which he dis-

armed her and presumably inflicted the injuries which led to her death."

The court also found it persuasive defendant did not suffer any significant wounds during the struggle. Nurse Gilliland testified that the source of defendant's abdominal scar was purely medical. Defendant had only minor abrasions on his hands which required no medical attention. The court examined photographs of the cuts on defendant's hand and decedent's gaping defensive wounds and found no comparison. The court said:

"I must believe if I am to find a reasonable doubt here that his wife attacked him in a fury and in a rage with a relatively sharp knife, [the straight-edged knife] is certainly not dull, and he was able to grab that knife as it was thrust at him hard enough to at least penetrate to a degree the skin over his stomach or abdomen, snap that blade off, and not cut his hand. I find that impossible, frankly, to believe."

The court stated it was convinced beyond a reasonable doubt decedent did not attack defendant with either knife, but the first attack with the knife was made by defendant after decedent threw the pot of beans at him. Defendant was found guilty of murder.

Apparently, defense counsel failed to interview Dr. Ho prior to trial and was allegedly surprised by the doctor's two-knife theory. Accordingly, defendant filed a post-trial motion in which he alleged Dr. Ho's conclusion decedent was stabbed with two different knives is contrary to accepted medical opinion. At a hearing on the post-trial motion, forensic pathologist Dr. Grant Johnson testified "[a] stab wound or cut produced by a serrated blade cannot be distinguished from an injury produced by a nonserrated one." Dr. Johnson did not personally examine decedent's body or the two knives with which she was allegedly stabbed. His conclusion was based on his autopsy experience and experiments he had performed on human tissue.

Dr. Johnson examined the autopsy report, reviewed Dr. Ho's trial testimony and viewed numerous photographs of decedent's body. He disagreed with Dr. Ho's ability to conclusively determine the source of the wounds by measuring their size and examining the margins. Dr. Johnson said a serrated blade will not necessarily make a wound with an uneven margin. Accordingly, Dr. Johnson was unable to determine whether the 66 stab wounds on decedent's body had been produced by one or more knives with a serrated or nonserrated configuration.

On cross-examination Dr. Johnson admitted that, although it was

unlikely, the examining physician, Dr. Ho, could have made such a determination. Dr. Johnson testified under unusual circumstances it might be possible to tell that a wound was made with a serrated knife, but it is impossible to say that a smooth-margined wound was definitely made with a straight-edged knife. The literature on forensic pathology supports Dr. Johnson's theory.

The trial court acknowledged the validity of Dr. Johnson's testimony but denied defendant's motion to reconsider or, in the alternative, for a new trial. The court completely discarded the conflicting medical evidence, reexamined the remaining evidence and again concluded the State rebutted defendant's defense. The court still did not believe decedent attacked defendant with the knives or that defendant was seriously provoked to kill his wife.

■■ ■ The offense of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) can be reduced to voluntary manslaughter (Ill. Rev. Stat. 1985, ch. 38, par. 9—2) if "at the time of the killing [defendant] is acting under a sudden and intense passion resulting from serious provocation by: (1) The individual killed" (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)(1)). "[W]hen the defendant in a murder trial introduces some evidence of intense passion or of unreasonable belief, it is to be treated as a partial affirmative defense and the burden is on the State to negate the elements which would lead to a verdict of voluntary manslaughter." *People v. Bolden* (1985), 132 Ill. App. 3d 1047, 1058, 477 N.E.2d 1380, 1387.

This court has the power under Supreme Court Rule 615(b)(3) (87 Ill. 2d R. 615(b)(3)) to reduce defendant's murder conviction to one of voluntary manslaughter; however, this authority should not be exercised capriciously. (*People v. Cooke* (1969), 117 Ill. App. 2d 296, 254 N.E.2d 293.) The question whether a defendant committed murder or voluntary manslaughter is normally an issue for the trier of fact to resolve. (*People v. Davis* (1966), 35 Ill. 2d 55, 219 N.E.2d 468; *People v. Dillon* (1975), 28 Ill. App. 3d 11, 327 N.E.2d 225.) We note the trier of fact was the bench rather than a jury in this case. The record indicates the trial court's decision was the result of careful and diligent deliberation.

The function of this court is not to retry the defendant but to review the evidence in a light most favorable to the prosecution and determine if any rational trier of fact could have found defendant guilty of murder. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) This principle is especially applicable to situations where, as here, defendant is the only living person who directly witnessed the homicide. In such situations, the trier of fact is not obli-

gated to accept the defendant's version of events. Instead it may judge the defendant's version incredible and find the defendant guilty of murder on the basis of circumstantial evidence. (*People v. Uher* (1940), 375 Ill. 499, 31 N.E.2d 936.) Where a conviction is based solely on circumstantial evidence, the facts established at trial, taken as a whole, must be consistent with the accused's guilt and inconsistent with any reasonable hypothesis of innocence. (*People v. Branion* (1970), 47 Ill. 2d 70, 265 N.E.2d 1, *cert. denied* (1971), 403 U.S. 907, 29 L. Ed. 2d 683, 91 S. Ct. 2213.) In determining whether circumstantial evidence establishes a defendant's guilt beyond a reasonable doubt, the trier of fact may consider the defendant's credibility and the reasonableness of any hypothesis of innocence. See *People v. Jones* (1985), 105 Ill. 2d 342, 475 N.E.2d 832; *People v. Hendricks* (1986), 145 Ill. App. 3d 71, 495 N.E.2d 85.

The contention that defendant was provoked into stabbing decedent rests on one essential question of fact—whether decedent first attacked defendant with a knife or knives. We agree in this case there is sufficient circumstantial evidence beyond the medical evidence from which the circuit court could have concluded beyond a reasonable doubt defendant did not kill his wife as a result of a sudden and intense passion. Although the trial court could have stressed defendant's lack of veracity, we support its reliance on the following four factors to negate defendant's voluntary manslaughter defense:

(1) Mr. Armour testified defendant predicted something was going to happen if he did not move out of his wife's house. Later that day decedent was stabbed over 60 times.

(2) Defendant admitted no hostile exchange preceded the attack. In *People v. Hudson* (1979), 71 Ill. App. 3d 504, 390 N.E.2d 5, the court reduced the defendant's conviction of murder to manslaughter. The victim and defendant had engaged in a fist fight for 5 to 10 minutes prior to the stabbing. The court held:

> "Mutual quarrel or combat is sufficient to support a finding of serious provocation. [Citations.] The term 'mutual combat' has been defined as one into which both parties enter willingly, or in which two persons, upon a sudden quarrel and in hot blood, mutually fight on equal terms." *Hudson*, 71 Ill. App. 3d at 510, 390 N.E.2d at 9.

The State notes defendant's own testimony refutes the idea of a mutual combat. According to defendant, he walked into the house, kissed his wife and went into the living room. Decedent then came from the kitchen and threw a pot of beans at him. Defendant avoided the pot and attempted to talk to her. She then reentered the

kitchen and approached defendant with a knife. After defendant disarmed her, she grabbed another knife which defendant also obtained. It was only after decedent was unarmed and the two were on unequal terms that defendant stabbed her repeatedly.

(3) The photographic evidence of the wounds on decedent's hands was far more indicative of defensive wounds than the abrasions on defendant's hands.

(4) Defendant had no wounds on his body absent some minor abrasions, yet he claims decedent stabbed and cut him several times with a knife. Certainly if he had broken the blade of the smooth-edged knife with his hand he would have sustained a noticeable wound. Both the paramedic at the scene of the car accident and Nurse Gilliland denied defendant had any external injuries. The wound on defendant's stomach was inflicted by a surgeon, not by decedent, and the only cuts and bruises defendant suffered appeared to be of the type caused by a car accident rather than a knife attack.

The trial court emphasized the fact defendant claimed he was wounded when he was not. We agree that discrepancy casts grave doubt on defendant's veracity and is circumstantial evidence which tends to refute defendant's story that decedent provoked her fatal stabbing. All the evidence compels us to agree with the trial court's conclusion decedent did not attack defendant with one or even two knives. Although she did indeed throw a pot of beans at him, such action does not constitute serious provocation under section 9—2(a)(1). Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)(1).

Next, defendant argues he was denied effective assistance of counsel because defense counsel did not conduct a pretrial interview of Dr. Ho or Nurse Gilliland, two of the State's key witnesses disclosed in response to defendant's discovery motion. As was already noted, the trial court accorded great weight to the testimony of the pathologist and the trauma treatment nurse when it initially rejected defendant's passion-provocation defense.

The standard for judging defense counsel's effectiveness was announced in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and adopted by our supreme court in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061. The defendant must show his trial counsel's performance was sufficiently deficient to prejudice him and undermine confidence in the outcome. "Even a professionally unreasonable error does not warrant setting aside the judgment in a criminal case if the error had no prejudicial effect on the judgment." *People v. Van Ostran* (1988), 168 Ill. App.

3d 517, 522, 522 N.E.2d 851, 854.

Defendant notes failure by counsel to interview witnesses has been held to constitute "actual incompetence," especially if the witnesses were revealed through discovery and the testimony may have been favorable. (*People v. Corder* (1982), 103 Ill. App. 3d 434, 431 N.E.2d 701; *People v. Bell* (1987), 152 Ill. App. 3d 1007, 505 N.E.2d 365.) In both *Corder* and *Bell* the court declared counsel's assistance ineffective because defendant was *prejudiced* by the failure to adequately investigate and interview key witnesses.

Defendant maintains had his counsel interviewed Dr. Ho pretrial he would have discovered the two-knife theory and could have directly rebutted it with Dr. Johnson's theory. Dr. Johnson's testimony at the post-trial hearing was not as effective and did not carry as much weight, according to defendant. Thus, the outcome of the case would have been different if Dr. Ho had been interviewed prior to trial. We disagree.

The trial court commented on defense counsel's extensive and skillful cross-examination of Dr. Ho during which counsel emphasized a lack of scientific evidence to support the doctor's two-knife theory. Indeed, the record indicates defense counsel was prepared for, rather than surprised by, the doctor's testimony.

Later, defense counsel reopened his case and admitted into evidence an excerpt from a learned treatise on edged weapons. The excerpt reported the precise characteristics of an edged weapon can rarely be positively determined by an examination of the wound. The treatise tended to refute Dr. Ho's theory, which he reached by merely measuring the wounds.

Finally, defense counsel brought in Dr. Johnson post-trial to further refute Dr. Ho's theory. Ultimately, it was defense counsel who persuaded the trial court to disregard the medical evidence altogether. Even without Dr. Ho's testimony, the trial court rejected defendant's passion-provocation defense. A pretrial interview of Dr. Ho would not have altered the result.

Defendant also contends he was prejudiced because his counsel did not interview Nurse Gilliland pretrial. Had defense counsel learned the cause of defendant's stomach wound he could have refreshed his client's memory and avoided the damaging impeachment at trial.

In *People v. Howard* (1979), 74 Ill. App. 3d 138, 392 N.E.2d 775, the defendant was found competent to stand trial on a charge of aggravated battery. The appellate court held defense counsel's failure to investigate and discover records of defendant's psychiatric history,

which were readily available, constituted ineffective assistance of counsel. The undiscovered reports would have shown defendant had a history of violent and paranoid behavior. Failure to discover them severely prejudiced the outcome of defendant's competency hearing in *Howard,* a consequence the defendant here did not suffer.

It is true Nurse Gilliland's testimony refuting defendant's story that decedent attacked him with a knife was a major factor the trial court considered when it rejected defendant's voluntary manslaughter defense. However, her testimony was not the only evidence. A paramedic also testified defendant was not wounded or bleeding when he was examined at the scene of the car accident. The court also considered other factors—the statement to Armour, the absence of mutual combat and the photographic evidence—which together disproved defendant's claim he was wounded and thus provoked to stab his wife to death.

The general rule is a conviction will not be disturbed on the basis of ineffective assistance of counsel unless the totality of counsel's conduct is incompetent. (*Bell,* 152 Ill. App. 3d 1007, 505 N.E.2d 365.) Here, defendant's trial counsel did not interview two of the State's most important witnesses. However, the record indicates defense counsel made every effort at trial and post-trial to compensate for any initial lack of diligence. While we acknowledge the necessity of thorough trial preparation, the conduct of defendant's trial counsel as a whole was not incompetent or ineffective.

We conclude a pretrial interview of Dr. Ho and Nurse Gilliland could not have negated the circumstantial evidence which ultimately defeated defendant's defense of voluntary manslaughter. Accordingly, we decline to reduce the degree of defendant's murder conviction. The judgment of the circuit court of Champaign County is affirmed.

Affirmed.

McCULLOUGH and SPITZ, JJ., concur.