THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JERRY WILLIAMS, Defendant-Appellant.

Fourth District   No. 4—84—0839

Opinion filed June 28, 1985.

Daniel D. Yuhas and Deborah L. Rose, both of State Appellate De-
fender's Office, of Springfield, for appellant.

Thomas K. Leeper, State's Attorney, of Quincy (Robert J. Biderman and
Michael Blazicek, both of State's Attorneys Appellate Service Commission,
of counsel), for the People.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

On July 9, 1984, an information was filed in the circuit court of Adams County charging defendant, Jerry Williams, with the murder of his 13-year-old niece, Michelle Powell. After a trial by jury, a judgment of conviction was entered on October 25, 1984. After a sentencing hearing, on November 30, 1984, the trial court found that the crime was performed in an exceptionally brutal and heinous manner and imposed an extended-term sentence of 50 years' imprisonment. Defendant appeals contending that (1) he was denied due process because the trial court did not instruct the jury that the State was required to negate, by proof beyond a reasonable doubt, certain elements that would have reduced the homicide to voluntary manslaughter, and (2) the sentence was excessive. We affirm.

By his own admission at trial, defendant killed Michelle on the afternoon of June 30, 1984, and then hid her body. When found, the body had skull lacerations in the area of the forehead and the left temple and a gaping wound to the throat. Michelle was approximately 5 feet 6 inches in height and weighed approximately 98 pounds. Defendant had retired after 15 years service in the Army and had some disability in his lower left leg, resulting from a wound in Vietnam. He testified that the wound impaired his mobility. He maintained that he killed Michelle in self-defense. The evidence at trial centered on the testimony of investigators as to two inconsistent versions of the events surrounding the killing which defendant told to investigators and defendant's testimony which was inconsistent with both of those versions.

According to the first version, Michelle came to defendant's house at about 3:30 p.m. and asked to borrow $20 so that she could buy T-shirts for herself and a boyfriend. Defendant told investigators that she became angry when he refused, grabbed a butcher knife and started slashing at him. Defendant then backed away, picked up a large stove bolt and, as she advanced, hit her on the left side of her head. According to this version, she continued to advance, so he hit her on the top of the head and grabbed her hand holding the knife. According to the investigators, defendant said that she then stumbled into him, at which time the knife was near her throat and they "together" slashed her throat. Defendant was reported to have stated that Michelle died at that time, and so he wrapped her body in a blanket and disposed of it.

The investigators testified that several hours after giving the foregoing statements, defendant told them that it was not true. He

then contended that when she asked for $20, he told her he could give her $5 but intimated that it would be for sexual favors. When she still demanded $20, he gave her $10 and told her "to take it or leave it." Defendant purportedly said that Michelle went into the living room and sat on the couch and he followed her and put his arm around her, but she pushed his arm away in a few minutes and walked back to the kitchen. According to the investigators, defendant admitted that he then hit her in the back of the head with the stove bolt, next hit her with a bottle and, as she lay on the floor, he slit her throat with a knife.

In testifying in his own defense, defendant stated that when Michelle requested $20, he gave her $5, saying that was all he could give her. Defendant denied having told the investigator anything about his request for sexual favors. Defendant then stated that "there was no verbal, you might say verbal conversation of sex or anything of that nature, but it was more an impression that one person would give another one, say, through eye-to-eye contact, that you could take it either way, or just about any way." According to defendant, Michelle then got up from the table and went into the living room and he followed her. Defendant said she kicked off her shoes and sat on the couch, and he sat down in the middle of the couch but did not put his arms around her. Defendant stated that she then walked away, saying "no, man, no, man" and "oh, no, man" and went to the kitchen table and picked up a knife. Defendant further testified that:

> "She seemed like she was turning around and reaching behind her, or on the side of her, and grabbing the handle of the knife. I guess I thought I was in jeopardy, or whatever, or marked the defense, I don't know. I just immediately bent down and knowing where we keep our door stop you might say, reached down, picked it up, and in one continuous motion, came up and hit her on the head."

Defendant told the jury that Michelle had been in the process of turning around when he hit her and that after he did so, she completed her turn and faced him. He said he then saw a "flicker or a flash of something" which he thought was the knife. He told the jury that at this point he hit Michelle in the head and threw the bolt on the floor. He said, "I guess I was stunned because she started coming toward me, or advancing on me, and I thought that it was over." He testified that Michelle continued to advance toward him and that he tripped and they both fell. He told the jury that he was sitting on her left arm, straddling her waist, with his left arm hold-

ing her right arm down. He said that Michelle struggled and he reached over and picked up a soda bottle and hit her in the left temple area. He said that he hit her because he did not know if she had anything in her hands and he wanted to subdue her.

Defendant described the next few minutes in the following words:

> "Like I said, this is hard to describe. It's a blur. I come back and the damage had been done to her throat area. Her throat was cut. The blade of the knife was next to her throat, or above it. I couldn't even say if it was on it. My hand was on the handle of the knife. I don't know if her hand or anything else was in that general area."

The weakness in defendant's contention that he believed it was necessary to slit Michelle's throat in order to protect himself is readily apparent. We consider the question of whether reversible error resulted from the method in which the jury was instructed in the light of the weakness in defendant's theory and the very strong proof that he was guilty of murder.

Section 9—2(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(b)) provides that one who "intentionally or knowingly kills an individual commits voluntary manslaughter if" the killer has an unreasonable belief that circumstances exist that would legally justify the killing. Some evidence was presented here that defendant had such an unreasonable belief, and the trial court instructed the jury that the jury could find the defendant merely guilty of voluntary manslaughter. The court did so by a series of instructions which were tendered by the State, and to which the defendant made no objection.

One such instruction was in the form of Illinois Pattern Jury Instruction (IPI), Criminal, No. 7.06 (2d ed. 1981). It required the State to prove beyond a reasonable doubt every element of voluntary manslaughter as defined by section 9—2(b). The jury was also instructed that defendant was charged with murder which included the offense of voluntary manslaughter. The jury was then instructed as to the issues in murder by an instruction in conformity with IPI Criminal 2d Nos. 7.02 and 24—25.06A. The instructions required the State to prove beyond a reasonable doubt each of the statutory elements of murder based on intent (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(1)) and also required the State to so prove that the killing was not justified. The instruction did not require the State to negate the existence of an unreasonable belief on the part of defendant that would reduce the severity of the homicide from murder to voluntary

manslaughter under section 9—2(b). The manner of instructing the jury was in conformity with the traditional manner of doing so when issues of self-defense and voluntary manslaughter have been raised.

At least since 1981, defense counsel have been contending that the format of IPI Criminal (2d ed. 1981) and, more particularly, the wording of IPI Criminal 2d No. 7.02 is erroneous in cases where murder is charged and the question of whether the defendant's conduct merely constituted voluntary manslaughter is supported by some evidence. They have contended that the State is required to negate, by proof beyond a reasonable doubt, the existence of the voluntary manslaughter elements of provocation or passion (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a)) or, as here, unreasonable belief of justification (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(b)). We recognized the problem in *People v. March* (1981), 95 Ill. App. 3d 46, 419 N.E.2d 1212, and *People v. Wood* (1984), 129 Ill. App. 3d 29, 471 N.E.2d 1060, but were unwilling to hold the approved and established method of instructing the jury to constitute reversible error. In *People v. McGee* (1982), 110 Ill. App. 3d 766, 443 N.E.2d 1057, the court followed our holding in *March.*

Raising the question for the first time on appeal, defendant asks us to hold that the failure of the instructions here to require the State to negate, by proof beyond a reasonable doubt, that he had an unreasonable belief that killing Michelle was justified in self-defense, deprived him of due process. After defendant's original brief was filed and before the State's brief was due, we filed our opinion in *People v. Bolden* (1985), 132 Ill. App. 3d 1047. We stated,

> "[T]hat when the defendant in a murder trial introduces some evidence of intense passion or of unreasonable belief, it is to be treated as a partial affirmative defense and the burden is on the State to negate the elements which would lead to a verdict of voluntary manslaughter. To the extent that *March* appears inapposite, it will no longer be followed. We suggest that the existing jury instructions are not adequate ***." (132 Ill. App. 3d 1047, 1058.)

In *Bolden,* we noted that in *People v. Hoffer* (1985), 106 Ill. 2d 186, the supreme court confirmed that voluntary manslaughter based upon an unreasonable belief is an included offense of murder.

The State requests that we recede from the rule we announced in *Bolden.* The State contends that under *Bolden,* in homicide cases where murder is charged and the question of voluntary manslaughter raised, the State "must prove both the absence and presence of the mitigating elements" in an attempt to get a conviction on one of

the offenses. We disagree.

In *Hoffer,* a defendant had been convicted of both murder and voluntary manslaughter arising out of the same act. The supreme court affirmed the appellate court's decision reversing and remanding for a new trial on the basis that the verdicts indicated that the jury was confused. The trial court had instructed the jury that the jury was required to find that the element of unreasonable belief on the part of the defendant had to be disproved in order to find the defendant guilty of murder. The supreme court stated that this was the proper form for the issues instruction in this type of case. The court described the unreasonable-belief mental-state element of section 9—2(b) manslaughter as a "diminishing degree of mental culpability" when compared to the mental state for murder other than felony murder. *People v. Hoffer* (1985), 106 Ill. 2d 186, 194.

■ Clearly, in order to prove a defendant guilty of murder (other than felony murder) or section 9—2(b) voluntary manslaughter, the State must prove beyond a reasonable doubt the elements of murder, which may include the negating of an affirmative defense. It is equally clear that if no evidence is presented to show the offense is actually voluntary manslaughter, the foregoing proof is such that the jury should return a verdict of guilty as to murder only. However, under *Hoffer* and *Bolden,* where there is evidence of voluntary manslaughter, and the defense requests such an instruction, the court must instruct the jury that the State must negate the mitigating elements of voluntary manslaughter beyond a reasonable doubt in order to permit a guilty verdict on the murder charge.

Consistent with the requirement to acquit the defendant of murder because of inability to negate the elements of voluntary manslaughter, logic requires that the defendant then be convicted of voluntary manslaughter even though the mitigating elements for voluntary manslaughter have not been proved beyond a reasonable doubt. The reason for the seemingly questionable result is that the mental states of unreasonable belief, passion or provocation are states of lesser culpability which do not need to be proved where a defendant relies on the inability of the State to negate their existence in order to lessen the culpability of his otherwise murderous conduct.

■ Although we uphold *Bolden,* we do not deem reversal to be required here. Much argument is made as to whether *Bolden* should be given a prospective or retroactive application. We need not decide that. The instructions here do not give any indication that any burden of persuasion is placed upon the defendant. As the majority of

this court concluded in *March,* under the combined effect of *Mullaney v. Wilbur* (1975), 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881, and *Patterson v. New York* (1977), 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319, the form of instructions used here does not work a constitutional deprivation on the defendant. (*People v. March* (1981), 95 Ill. App. 3d 46, 61, 419 N.E.2d 1212, 1220.) The issue of the instructions was not raised in the trial court, and thus the error is reversible only if the interests of justice so require. 87 Ill. 2d R. 451(c).

As we have indicated, the instructions given did not misplace any burden of proof on the defendant. There is no indication that the jury was confused. The evidence was not close. Rather it strongly supported the verdict finding the defendant guilty of murder. Under such circumstances, any error in the instructions arising from our ruling in *Bolden* is not such that the interests of justice require a reversal of the conviction and a remand for a new trial. *People v. Huckstead* (1982), 91 Ill. 2d 536, 440 N.E.2d 1248; *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331.

■ We feel certain that it is only with reluctance that a trial court imposes a sentence of 50 years' imprisonment upon a man who served his country in battle and was wounded in the process. It is only with reluctance that a reviewing court affirms such a sentence, but that must be done here. The evidence of the manner in which the murder was performed fully supports the court's determination that it was exceptionally brutal or heinous behavior indicative of wanton cruelty, and it justified an extended term. (Ill. Rev. Stat. 1983, ch. 38, pars. 1005—5—3.2(b)(2), 1005—8—2(a)(1).) Thus, although the defendant had no other substantial mark against him, there is no indication that the court abused its discretion in ordering a sentence of this severity. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

The sentence and conviction are affirmed.

Affirmed.

McCULLOUGH and MORTHLAND, JJ., concur.