THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ODELL L. BURNS, JR., Defendant-Appellant.

Fourth District   No. 4—85—0567

Opinion filed June 16, 1986.

Daniel D. Yuhas and Allen H. Andrews, both of State Appellate Defender's Office, of Springfield, for appellant.

J. William Roberts, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and Kenneth R. Baumgarten, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MORTHLAND delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1). He was sentenced to a 24-year term of imprisonment.

Defendant appeals, alleging four separate errors as grounds for reversal. However, three of these four points were not raised below by the defendant. Normally, a failure by a defendant to raise an issue before the trial court or in a written motion for a new trial constitutes waiver of that issue; the matter cannot be urged as grounds for reversal on review, even if it involves a constitutional right. (*People v. Friesland* (1985), 109 Ill. 2d 369, 374, 488 N.E.2d 261, 262; *People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856, 858; *People v. Black* (1972), 52 Ill. 2d 544, 288 N.E.2d 376, *cert. denied* (1973), 411

U.S. 967, 36 L. Ed. 2d 689, 93 S. Ct. 2155.) However, the general rule of waiver is not absolute. Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)) embodies a limited exception to ameliorate the harshness of a strict application of the waiver rule. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Rule 615(a) states:

> "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 87 Ill. 2d R. 615(a).

■ Accordingly, a reviewing court may elect to take notice of plain errors affecting substantial rights. (*People v. Friesland* (1985), 109 Ill. 2d 369, 375, 488 N.E.2d 261, 263.) Still, the plain-error doctrine under Rule 615(a) does not operate in the nature of a general savings clause, preserving for review all errors affecting substantial rights whether or not they were brought to the attention of the trial court. (*People v. Precup* (1978), 73 Ill. 2d 7, 16, 382 N.E.2d 227.) A significant purpose of the plain-error exception is to correct any injustices done the defendant. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576, 404 N.E.2d 233, 238.) It therefore becomes relevant to examine the strength or weakness of the evidence against the defendant; if the evidence is close, there is a possibility that an innocent person may have been convicted due to some error which is obvious from the record though not properly preserved for appeal. 79 Ill. 2d 564, 404 N.E.2d 233.

Thus, where the evidence is closely balanced, a court of appeal may still consider errors not properly preserved for review. (*People v. Howell* (1975), 60 Ill. 2d 117, 121, 324 N.E.2d 403.) In such cases, courts of review will grant relief if the trial error is so prejudicial that real justice has been denied or the jury verdict may have resulted from such error. (*People v. Wright* (1974), 56 Ill. 2d 523, 533-34, 309 N.E.2d 537; *People v. Manzella* (1973), 56 Ill. 2d 187, 200, 306 N.E.2d 16, *cert. denied* (1974), 417 U.S. 933, 41 L. Ed. 2d 236, 94 S. Ct. 2644.) In all instances, though, the evidence must be close factually for Rule 615(a) to be called into play.

Under the plain-error doctrine, we must consider the strength of the evidence presented at trial along with the substantial legal issues raised. Accordingly, we shall set forth the testimony in some detail.

By information, defendant was charged with four counts of murder arising out of the August 4, 1984, shooting death of Charles Medley. On March 25, 1985, the defendant went to trial on those charges.

The State first called Angela Marie White, the nine-year-old daughter of the victim. She testified that she formerly lived with her late father, her mother (Brenda White) and her three younger sisters

in certain public housing projects in Springfield. The layout of their apartment residence consisted of a living room and kitchen downstairs, two bedrooms and a bathroom upstairs, and stairs near the front door leading to the second floor. The front and rear entrances were located on the first floor or ground level of the unit.

On the night of the shooting, Angela testified she was at home with her sisters and her father. Charles Medley was upstairs in the bathroom when there was a knock at the front door; Angela was also upstairs at the time. Medley went downstairs to answer the door, and Angela went from her room down the stairs about two or three steps. From there she could see the back of her father. He was not carrying anything, and was wearing only a pair of shorts. He opened the screen door about an inch to an inch and one-half. Angela testified she saw the defendant and another man in the doorway. She stated she had no trouble seeing because the living room and hallway lights near the stairs were turned on. The other man was about one inch taller than the defendant. She recalled that the defendant was wearing a black jacket and possibly blue jeans.

Angela observed the defendant with a gun and a piece of green cloth or towelling in his hands. She then saw the defendant shoot her father in the neck. The defendant was standing outside when he fired the shot; her father was standing inside, and he fell down on his back after the shot. Angela then went upstairs into her room. She heard a second shot and called the police. After that, she got into bed and pulled the covers over her head because she was scared.

On cross-examination, Angela related that the defendant had been at her home earlier that evening talking to her father and another man. She further testified that she may have seen her father get up and fall again inside the residence after the first shot.

Next, Lavanon "Barry" Young testified that at about 11 p.m. on August 4, 1984, he was sitting in his parked car at 13th and Mason streets in Springfield. He saw the defendant, whom he knew, "walking fast" from the back of a building on 13th Place. The defendant came around the car and got in on the passenger's side. Defendant had a gun in his hands, and was wearing a black leather vest. Young testified that the defendant told him to "pull off." As they drove away, defendant stated to him: "That nigger, Charles Medley, tripped and I wonder if I killed him." Young recalled that the defendant was scared, and he was wiping blood from his leg.

At the direction of the defendant, Young eventually stopped the car near a wooded area at the corner of 19th and Lawrence streets. While Young remained in the car, the defendant got out and walked

up the hill. When the defendant returned a few minutes later, Young noticed he no longer possessed either the gun or the jacket. The defendant then directed Young to drop him off at the corner of 11th and South Grand. As they were driving, Young testified the defendant stated to him: "Don't trip and don't tell anyone, you know, what happened." Young stated that after he dropped the defendant off, he went to the police station and gave a written statement.

On cross-examination, Young stated the defendant's clothes were "stressed" when he got into the car, as though the defendant had been in a fight. There was also some discrepancy as to the content of statements Young purportedly made to the defendant's attorney during an earlier interview. Counsel related the following statement he attributed to Young during that interview: "That nigger, Charles. I spent $200 with that man today and I'm $5 short and he wants to treat me like a punk. The man tried to put me out of his crib (house). [Expletive] that nigger." However, Young did not recall making that statement, nor did he recall the defendant saying that. Young reiterated that the defendant told him in the car that Charles Medley "tripped" and the defendant wondered if he had killed him. Young also remembered the defendant saying: "that nigger, Charles Medley, upped a gun on me; that nigger tripped." However, Young testified the defendant made this statement at some later time and not on the night of the killing.

Officer John Meyer of the Springfield police department testified that, upon responding to a call of a shooting on August 4, 1984, he found the victim lying on his back facing the front door at the base of the stairs near the entrance to the apartment. He noted one set of bloody footprints leading from the front door to the rear door. He did not recall that any furniture was moved around in the apartment, although he related a coffee table was kicked out the way by paramedics when they arrived. The victim was dragged into the living room so that paramedics could administer emergency medical care in the larger area there.

Officer John Bolinger testified he accompanied Barry Young that evening to the wooded area at 19th and Lawrence, where he located a black leather-type jacket under some bushes. He proceeded to poke the jacket with a flashlight, and noted a hard object about the size of a handgun inside.

Detective Tom Todd testified that he went to 19th and Lawrence and collected the black vest and a .38-caliber steel revolver. The revolver contained two spent and three live rounds. Black electrical tape was wrapped around the grip.

Detective Todd also examined the victim's apartment. He located a bullet hole in the screen door, with the wires around the hole pointing toward the apartment. A white powdery substance was discovered in the apartment that evening, as was a green leafy substance. He also located black human hair of unknown origin under a radiator in the kitchen. He admitted that the hair could have been forcibly removed. Todd noted that several items such as matches, crayons, and ticket stubs were on the floor, and the curtain behind the television was torn. Todd testified no fingerprints of comparison value were found anywhere in the apartment. There was blood on the floor at the entrance of the apartment and along the floor where the defendant was dragged into the living room. He noticed no other blood in the apartment except for the bloody footsteps heading out the back.

Dr. Victor Lary, a pathologist, stated that one bullet was recovered from the neck of the victim, and another bullet was recovered from the right groin area. He testified that Charles Medley died as a result of extensive blood loss and consequent shock from two gunshot wounds which severed large arteries in his neck and right thigh. Dr. Lary noted no other evidence of bruises or physical trauma. He further reported the wounds were not "contact wounds" which result where a gun is fired when pressed against the skin. Dr. Lary could not speculate as to whether the victim had been in a fight.

Krail Lattig, a forensic scientist with the Illinois Bureau of Scientific Services, tested the gun found in the field. He noted that the frame of the pistol was bent, which would tend to cause it to misfire.

Lattig further testified that the bullets removed from the body of the victim had been fired from the gun he tested. The bullet taken from the victim's neck area had ridge-like markings on the nose and gouges on the side running the length of the bullet. He stated this scoring and marking was not caused by the gun, but was consistent with what would be found on a bullet passing through a screen such as the one on the door of the victim's apartment. He fired bullets through that screen during his testing of the weapon, and the marks on the test bullets matched those found on the bullet recovered from the victim's neck. Finally, based upon his visual inspection and chemical testing of the garment the victim was wearing, it was Lattig's opinion that the gun was fired from a distance of 3 to 5 feet. However, he did not discount the possibility that it could have been fired from as close as 2 feet away.

J. Karsten Ryling, a drug and forensic chemist for the Illinois Department of Law Enforcement, Bureau of Scientific Services, testified that he examined four grams of white powder recovered from the vic-

tim's apartment. The white powder tested out as sodium bicarbonate, often used as a dilutant in cutting cocaine. Other substances found that evening were determined to be cannabis and cocaine.

It was stipulated by the parties that if Edward German were called to testify as a witness, he would state that he is a forensic scientist employed by the Illinois Department of Law Enforcement. He would further testify that he examined the gun, but could not locate any identifiable fingerprints on the revolver, tape, grip, or cartridges.

Detective Thomas Murphy of the Springfield police department was called by the defendant. He testified that he spoke with Brenda White, the victim's girlfriend and mother of Angela White, a few hours after the shooting. Brenda White indicated to him that her daughter Angela had information regarding the shooting; specifically, Angela had heard her father arguing downstairs with two men, and the incident may have turned into a fight.

Detective Murphy testified he personally interviewed Angela for the first time two weeks later. Angela told him she thought she heard a gun mentioned during that argument. However, on cross-examination, Murphy said Angela indicated the argument between her father and others occurred during a separate incident. Detective Murphy then continued to testify on cross-examination by summarizing his interview with Angela. His testimony recalling the interview substantially paralleled Angela's own testimony earlier in the trial. Murphy also stated that while investigating the scene of the shooting, he noticed that the drape in the apartment was torn, and the furniture was displaced when the paramedics came in.

Brenda White admitted during her testimony that Charles Medley might have sold drugs for a living, but denied that he owned a gun. She did recall that her brother had stolen a pistol from Charles Medley two years previously, but that was the last time Charles ever possessed a gun. White further related that Angela told her the night of the shooting that she had heard "loud talking," but that it occurred earlier in the evening, and not at the time of the shooting.

The defendant testified on his own behalf that he was friends with Charles Medley, had known him the majority of his life, and had never previously fought with him. Defendant did state that Charles Medley was a drug dealer, and he admitted buying drugs from Medley on a daily basis. Earlier in the evening of August 4, 1984, the defendant stated he had gone to Medley's apartment with another man named Jimmy Floyd. Defendant bought two $25 bags of cocaine for $40 from someone whom defendant described as a "doorman" for Medley. Defendant stated he did not see Charles Medley there at that time.

Defendant testified he left the apartment and "did the cocaine" with others. Defendant later saw "Barry" Young in his car and asked him for a ride to Medley's house so he could purchase more cocaine. Young dropped him off near Medley's apartment; defendant went to the apartment and knocked on the door. Medley answered, and he went inside. No one else was there.

Defendant testified that he and Medley went into the living room, where he told Medley he wanted to purchase more cocaine. Defendant paid for the cocaine and injected it there. However, he told Medley that this cocaine was not any good, and that the stuff he bought earlier was of much higher quality. An argument between the two ensued; Medley told the defendant to leave, but the defendant demanded either his money back or more cocaine. According to he defendant, Medley then went to a closet, pulled out a gun, and pointed it in his face. Defendant stated he grabbed the pistol, and the two began to wrestle in the living room area. Defendant stated that as they were fighting "the pistol just went off." The gun fell to the floor, but they continued to fight. The defendant then testified:

> "[F]inally I got away from him, and on my way out the door, I grabbed the pistol *** and I opened the door, and by the time I opened the door, and I was leaving, Charles pushed me out the door, and I fell over a barbecue grill and right then [the pistol went off]. I can't say if I pulled the trigger or if the trigger went off. All I know that man was in the door and the pistol went off, and that was it. He fell *** I thought he had died. I just panicked and I left his house."

Defendant stated he believed the entire fight lasted 1 to 1½ minutes.

Defendant ran out the back door through the kitchen. He ran around the back of the housing project and got into Barry Young's car. He related that he told Young: "That nigger, Charles, tripped me up, pulled a gun on me. I don't know, man, just take me home." Young drove him home, and he left the jacket and pistol in the car. Defendant stated he took a bath and burned his clothes. Later that night, upon learning that Young had gone to the police, he called a lawyer and went down to the county building.

Later during his testimony the defendant reiterated that he was running out the door when Medley pushed him. Defendant testified he fell backwards over the barbecue grill on the porch, and Medley was still coming towards him. The gun then discharged into Medley; the defendant did not know if he pulled the trigger or not.

During cross-examination, the defendant denied that he ever told a cellmate during September or October of 1984 that he had gone to

the Medley residence the evening of the shooting to rob Medley.

Finally, the State called Chester Travis in rebuttal, who testified that in the early morning hours of August 5, 1984, the defendant asked him how much it would cost to drive defendant to East St. Louis.

At the conclusion of the evidence, the jury received instructions and verdict forms for the offenses of murder, "unreasonable belief" voluntary manslaughter, and involuntary manslaughter. On March 27, 1985, the jury returned a verdict of guilty on the murder charge. The remaining jury verdict forms were left unsigned.

The defendant then filed a motion for judgment notwithstanding the verdict and for a new trial, later amended twice. At least one motion alleged that Angela White's mother had signaled to her during Angela's testimony. Eleven handwritten letters were submitted to the court complaining that she had done so. At a hearing on the post-trial motions held August 16, 1985, the trial court found there had been no coaching by the mother, and denied the motions or judgment notwithstanding the verdict and for a new trial. Defendant was then sentenced to a term of 24 years' imprisonment.

Defendant raises the following contentions on appeal: (1) the trial court erred when it did not instruct the jury that the State bore the burden of negating the elements of voluntary manslaughter; (2) reversible error occurred when the State during cross-examination of the defendant asked him whether he ever told a cellmate that he went to the residence of the victim the night of the shooting specifically to rob him, where the defendant denied making that statement and the State failed to present further evidence in rebuttal to substantiate such a statement; (3) the admission of testimony by a police detective corroborating a prior consistent statement by another witness constituted reversible error; and (4) the defendant was denied due process where a person in the courtroom signaled to a nine-year-old witness while she testified.

As to these first three issues, the alleged errors were not presented to the trial court. We must consider these matters within the context of the waiver doctrine.

I

The defendant initially contends that under this court's holdings in *People v. Bolden* (1985), 132 Ill. App. 3d 1047, 477 N.E.2d 1380, and *People v. Williams* (1985), 134 Ill. App. 3d 334, 480 N.E.2d 205, the trial court erred in failing to instruct the jury that the State bore the burden of disproving the "unreasonable belief" species of volun-

tary manslaughter. The defendant acknowledges that this failure to instruct was not objected to at the instruction conference or at any time prior to jury deliberations. The issue was also not raised by the defendant in any of his three post-trial motions. The defendant, though, maintains any claimed error has not been waived. Rather, counsel for the defendant advances that the evidence established the defendant unreasonably believed it was necessary to kill Charles Medley in his own defense, and it was therefore highly prejudicial for the court to fail to give a *Bolden* instruction.

In *Bolden,* the court recognized, following the supreme court in *People v. Hoffer* (1985), 106 Ill. 2d 186, 478 N.E.2d 335, *cert. denied* (1985), 474 U.S. 847, 88 L. Ed. 2d 114, 106 S. Ct. 139, that voluntary manslaughter, whether grounded upon intense passion or upon an unreasonable belief in the necessity of the force actually used, is an included offense of murder. (*People v. Bolden* (1985), 132 Ill. App. 3d 1047, 1057, 477 N.E.2d 1380, 1387.) This court then held:

"[W]hen the defendant in a murder trial introduces some evidence of intense passion or of unreasonable belief, it is to be treated as a partial affirmative defense and the burden is on the State to negate the elements which would lead to a verdict of voluntary manslaughter." 132 Ill. App. 3d 1047, 1058, 477 N.E.2d 1380, 1387.

This court again took the issue raised in *Bolden* in *People v. Williams* (1985), 134 Ill. App. 3d 334, 480 N.E.2d 205. In *Williams,* this court clearly recognized that, to prove a defendant guilty of murder or "unreasonable belief" voluntary manslaughter, the State must establish beyond a reasonable doubt the elements of murder, which may include negating an affirmative defense. Where there is no evidence of voluntary manslaughter, the jury should return a verdict of guilty as to murder only. This court then went on to state:

"However, under *Hoffer* and *Bolden,* where there is evidence of voluntary manslaughter, *and the defense requests such an instruction,* the court must instruct the jury that the State must negate the mitigating elements of voluntary manslaughter beyond a reasonable doubt in order to permit a guilty verdict on the murder charge." (Emphasis added.) 134 Ill. App. 3d 334, 339, 480 N.E.2d 205, 209.

Accordingly, where a defendant introduces evidence of these partial affirmative defenses to murder, the State bears the burden of negating or disproving the elements of either species of voluntary manslaughter. The jury must be so instructed where the defendant requests it unless, of course, such an instruction is so essential that the

court has a responsibility to give it.

The jury below was instructed as to the offenses of murder, "unreasonable belief" voluntary manslaughter, and involuntary manslaughter. They returned a signed verdict form of guilty of murder; the other verdict forms concerning voluntary and involuntary manslaughter were not signed. These instructions fairly matched those in the Illinois Pattern Jury Instructions (Illinois Pattern Jury Instructions Criminal Nos. 7.01, 7.02, 7.05, 7.06, 7.07, 7.08 (2d ed. 1981).) There is no indication that the defendant ever submitted a so-called *Bolden* instruction, and none was ever given. Indeed, IPI does not offer such an instruction.

The State cites cases dealing generally with the failure to object to jury instructions, a discussion which is of some merit. In *People v. Smith* (1978), 71 Ill. 2d 95, 374 N.E.2d 472, our supreme court recognized that a defendant is obligated not only to object to a particular instruction, but to tender proper instructions as well. Thus, a failure to either object or to tender a proper instruction will result in a waiver on appeal of any objections concerning lack of proper instruction. (*People v. Underwood* (1978), 72 Ill. 2d 124, 378 N.E.2d 513; *People v. Smith* (1978), 71 Ill. 2d 95, 374 N.E.2d 472.) In this context, the waiver rule insures that a court may correct defects before the instructions are given. Otherwise, a party who does not object may gain an advantage based upon his own failure to act. *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331.

As we have earlier discussed, though, the waiver rule is not absolute, and Rule 615(a) provides a limited exception for plain errors. Also of relevance is Supreme Court Rule 451(c), concerning the giving of jury instructions. That rule provides that "substantial defects are not waived by failure to make timely objections thereto if the interests of justice require." 87 Ill. 2d R. 451(c).

Thus, where there is a failure to object to an instruction, waiver is the rule, to which Rule 451(c) is also a limited exception. (*People v. Underwood* (1978), 72 Ill. 2d 124, 378 N.E.2d 513.) The rule is applicable only to correct serious or grave errors (*People v. Jenkins* (1977), 69 Ill. 2d 61, 66, 370 N.E.2d 532), where the case is close factually and those errors threaten the fundamental fairness of the defendant's trial (*People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331; *People v. Joyner* (1972), 50 Ill. 2d 302, 307, 278 N.E.2d 756). A reviewing court may, as a matter of grace, take notice of errors appearing in the record which deprived the accused of a fair and impartial trial. (*People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331.) Still, the main thrust under Rule 451(c) remains defects in instructions are

waived if not objected to unless they are "substantial" and the "interests of justice require" a reviewing court to consider them.

■■ We believe that any alleged error in the failure to give a *Bolden* instruction has clearly been waived by the defendant. First and foremost, the record discloses that at no time did the defendant ever tender an instruction regarding the State's burden of proof. Second, the evidence is not so close factually that the interests of justice require reversal. Nor is the error so plain that it affects a substantial right of the defendant.

Angela White, the nine-year-old daughter of the victim, provided eyewitness testimony. She stated she saw the defendant shoot her father in the neck through the screen door of the apartment. She also observed the defendant wearing a black leather vest or jacket. That article of clothing was later recovered along with the gun used in the shooting.

The defendant contends he was acting in self-defense, and points to the condition of the apartment as depicted by photographs introduced at trial. However, Officer Meyer testified that some furniture was shoved out of the way by paramedics when they arrived on the scene. Meyer found the victim lying on his back facing the front door. Blood was located only at that point on the inside of the door, except for the bloody footprints leading out the back of the apartment and the bloody streak where the body was dragged by paramedics. Significantly, no blood was found in the living room area, where the alleged struggle took place. According to Detective Todd, no blood was found outside the front door of the apartment.

Particularly damaging to defendant's case is some of the technical and scientific evidence introduced. A bullet hole was found in the screen door pointing inward. The markings on the bullet found in the victim's neck indicate that particular bullet went through the screen. This is consistent with the girl's testimony that she saw the defendant shoot through the screen door and hit her father in the neck. On the other hand, if the defendant's testimony is to be believed, Medley was shot in the area of the right groin or thigh during their struggle in the living room. They continued to fight, although a pathologist testified the bullet severed a major artery. Then, the defendant grabbed the gun and ran out the door. According to the defendant, Medley pushed him as he ran. Defendant states he then fell backwards over the barbecue grill. As he fell, the gun somehow discharged, firing a bullet which went through the screen door and lodged in Medley's neck. Viewing the evidence, that is the only possible scenario consistent with the defendant's testimony, given that two shots were fired,

and the screen markings were found on the bullet taken from the victim's neck.

A forensic scientist testified that the gun was fired from a distance of 3 to 5 feet, although it could have been discharged as close as 2 feet away. These distances do not match the close proximity at which Medley would have been shot during the struggle as the defendant claimed. It is also not necessarily consistent with the further distance from which the gun was allegedly fired when the defendant tripped over the grill on the porch.

Considering the evidence *in toto*, the defendant's version is highly questionable. There was an eyewitness to the shooting, albeit the victim's daughter. The defendant's own testimony does not match that of others. Contrary to the defendant's assertions, there is no real evidence of a struggle in the apartment. Moreover, the defendant's story pales when considered in light of the technical or scientific evidence introduced. This was a matter of the credibility of the witnesses; the jury heard the testimony, and in their function as fact finder they adjudged the defendant guilty of murder.

Furthermore, there is nothing to indicate the State did not meet its burden of proof. The jury apparently was not confused, signing only the guilty verdict form for murder. We quote the following language from *Williams* as equally applicable to the case before us now:

> "[T]he instructions given did not misplace any burden of proof on the defendant. There is no indication that the jury was confused. The evidence was not close. Rather it strongly supported the verdict finding the defendant guilty of murder. Under such circumstances, any error in the instructions arising from our ruling in *Bolden* is not such that the interests of justice require a reversal of the conviction and a remand for a new trial. *People v. Huckstead* (1982), 91 Ill. 2d 536, 440 N.E.2d 1248; *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331." *People v. Williams* (1985), 134 Ill. App. 3d 334, 340, 480 N.E.2d 205, 209.

We are aware that instructions concerning the elements of an offense are among those basic instructions which must be given to ensure a fair determination of a defendant's case by a jury. (*People v. Davis* (1985), 130 Ill. App. 3d 864, 474 N.E.2d 878.) Failure to correctly inform the jury of the elements of the crime charged has been held to be such grave and fundamental error that the waiver rule should not apply. (*People v. Ogunsola* (1981), 87 Ill. 2d 216, 429 N.E.2d 861; *People v. Jenkins* (1977), 69 Ill. 2d 61, 370 N.E.2d 532.) However, we have before us a partial affirmative defense where the defendant did not offer any instruction at all, and the claimed error

was not substantial.

Finally in this area, the State asks us to reconsider our holdings in *Bolden* and *Williams*. However, in light of our disposition herein, we decline the invitation to do so.

## II

■ The defendant's second contention on appeal concerns the following exchange which took place during cross-examination of the defendant:

"Q. So, you were in the same cellblock with James Anderson, another person who is in custody, isn't that right?

A. He was in custody, yes, sir.

Q. And that was during, I believe, either September or October of 1984?

A. It's been since I've been up there, yes, sir.

Q. And isn't it a fact, sir, you told James Anderson that you went over to Charles Medley's house that night to rob him?

A. No, sir."

The State did not present James Anderson as a witness during rebuttal. The State did not otherwise introduce evidence to substantiate this claimed statement attributed to the defendant. The defendant thus contends that the State, by this line of questioning, insinuated that the defendant had intended to rob the victim the night of the shooting. According to the defendant, this intimation that a robbery had been planned effectively provided a motive for the killing. The defendant argues that this, in turn, contradicted his defenses of accidental shooting or self-defense, negating *a fortiori* the possibility he could be convicted of manslaughter instead. Because the State raised this insinuated motive before the jury, but failed in any way to substantiate it, the defendant believes he was prejudiced. As a result, he urges, the murder conviction should be reversed, and the cause remanded for a new trial.

As the defendant points out, where the State during cross-examination insinuates the existence of prior inconsistent statements by a witness, but later makes no attempt to prove that which has been implied, then prejudicial misconduct and reversible error may result. (*People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353.) Otherwise, a defendant would be subject to trial by insinuation and innuendo. (*People v. Morris* (1979), 79 Ill. App. 3d 318, 330, 398 N.E.2d 38, 47.) Unrestrained use of questions of this type "could be sanctioning improper tactics for the purpose of sowing suspicion in the minds of the jurors and substituting insinuation for proof." *People v. Orr* (1977), 45

Ill. App. 3d 660, 667, 359 N.E.2d 1237, 1242.

Again, though, we believe this error was waived. The defendant failed to object to the allegedly improper question during cross-examination. When it later became apparent that the State would not present evidence in rebuttal to substantiate the alleged statement, defense counsel did not direct the court's attention to the claimed error or move for a mistrial. Moreover, each of the defendant's three post-trial motions failed to include this allegation of error. As we have already discussed, we do not perceive the evidence here as being closely balanced. Defendant does not argue that he was not proved guilty beyond a reasonable doubt. We find no plain error which deprived the defendant of a fair trial. See *People v. Collins* (1979), 71 Ill. App. 3d 815, 390 N.E.2d 463.

In any event, considering the totality of the circumstances, if there was some prejudicial impact, it was slight. This case did not involve the repeated, substantial and unsupported insinuations made during cross-examination of several witnesses as was present in *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353. The supreme court in *Nuccio* reasoned that where the guilt of the accused rests primarily on the credibility accorded the witnesses, a new trial should be ordered where substantial unsupported insinuations seriously impeach their credibility. We have before us now one isolated question which, we believe, did not alter the jury's perception of the credibility of the witnesses in reaching its verdict.

Nor was the statement in question the only evidence linking the defendant to a shooting, as it was in *People v. Orr* (1977), 45 Ill. App. 3d 660, 359 N.E.2d 1237. In *Orr*, a witness for the defense was asked during re-cross-examination whether it was true that he had made a statement that the defendant had shot the victim in an attempt to fulfill a "contract" that was "out" on her. The witness replied in the negative. The State did not subsequently introduce evidence to contradict the witness' denial of the statement. The *Orr* court held the State's failure to do so was "clearly prejudicial" because the alleged statement "was the only potential evidence of a motive" offered by the State. (45 Ill. App. 3d 660, 666, 359 N.E.2d 1237, 1241.) Conversely, an eyewitness testified that she saw the defendant shoot the victim. Further, the unsupported statement here in question was not prejudicial, as other evidence was presented by which the jury could reasonably conclude the defendant was guilty of murder.

III

Third, defendant complains that the testimony of Detective

Murphy, elicited during cross-examination, constituted a prior consistent statement because it essentially recounted what nine-year-old Angela White said while she was on the witness stand. As such, defendant urges that this amounted to reversible error.

Detective Murphy was called as a witness for the defense. He stated he had spoken with Brenda White, the victim's girlfriend, on the night of the shooting. Brenda indicated that her daughter Angela had information regarding the shooting. According to Murphy, Brenda recounted that Angela had earlier told her that Charles Medley had been arguing downstairs in the apartment with two men. This argument might have turned into a fight.

Murphy first had occasion to personally interview Angela on August 16, 1984. Brenda White, the mother, was also present. During this interview, Angela stated she overheard an argument between her father and another man, during which time a gun was mentioned. Upon cross-examination by the State, Detective Murphy related that Angela told him the argument or loud talking she overheard did not occur at the time of the shooting, but instead took place during a separate incident. The following exchange then occurred:

"Q. Isn't it also true that when you did speak with Angela that—about the shooting now, the actual shooting about Charles Medley, that Angela said that her father was upstairs using the bathroom, that so was she. There was a knock. Her father went down to answer the door, and she went down the steps to see what was going on?

A. That's correct. She wasn't using the bathroom. Her father was.

Q. Isn't it also true that Angela told you she saw her father open the door, the screen door was closed, and that she saw—saw Odell Burns shoot her father?

A. That is correct.

Q. And isn't it also true that Angela told you that she ran back upstairs, heard another gunshot, and called the police?

A. That's correct."

Detective Murphy further testified that Angela was shown a number of photos from which she selected a picture of the defendant as the man who shot her father.

Defendant asserts that Murphy's testimony concerning what Angela White told him during the interview, which also substantially corroborated Angela's earlier testimony during the trial, amounted to a prior consistent statement. Defendant then states the general rule that a prior consistent statement made out of court by a witness

inadmissible, particularly where it is introduced to bolster the in-court testimony of that witness. (*Lyon v. Oliver* (1925), 316 Ill. 292, 147 N.E. 251; *People v. Green* (1984), 125 Ill. App. 3d 734, 466 N.E.2d 630; E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 611.14, at 398 (4th ed. 1984).) However, two clear but limited exceptions to this rule exist: (1) where testimony is introduced to refute a charge of recent fabrication; or (2) it is contended that the witness had a positive motive to testify falsely. (*Lyon v. Oliver* (1925), 316 Ill. 292, 147 N.E. 251; *People v. Green* (1984), 125 Ill. App. 3d 734, 466 N.E.2d 630; E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 611.14, at 398 (4th ed. 1984).) In each instance, the testimony may be introduced as proof to show that the witness told the same story when the motive did not exist. *People v. Tidwell* (1980), 88 Ill. App. 3d 808, 410 N.E.2d 1163.

The State contends that the defendant raised a charge of recent fabrication during the direct examination of Detective Murphy; thus, Murphy's testimony on cross-examination recounting Angela's statement was therefore proper to refute that charge. Further, the State urges that even if error did occur, Murphy's testimony was merely cumulative of Angela's testimony at trial, and any error was therefore harmless. (*People v. Smith* (1978), 64 Ill. App. 3d 1045, 382 N.E.2d 298.) Most importantly, the State again asserts waiver because the defendant failed to object at trial and failed to otherwise preserve the issue before the court.

The defendant answers that the recent fabrication exception is of no avail to the State here. Because two weeks elapsed between Murphy's first conversation with Brenda and his subsequent interview with Angela, the defendant avers that the motive for fabricating existed before Murphy took Angela's statement as well as at trial. In such circumstances, Illinois courts have consistently held that where the motive to testify falsely existed previous to the time when the prior statements were made, then those statements should not be admitted as corroborative testimony. *People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41; *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363; *Lyon v. Oliver* (1925), 316 Ill. 292, 147 N.E. 251; *People v. Green* (1984), 125 Ill. App. 3d 734, 466 N.E.2d 630.

It is defendant's assertion that the admission of Murphy's testimony severely prejudiced him because it impermissibly added to the credibility of Angela White. Defendant maintains that the shooting resulted out of self-defense. According to the defendant, the admission of Murphy's corroborative testimony is sufficient to invoke the doctrine of plain error. Continuing, the defendant advances that where

guilt or innocence depends entirely on the credibility of an accuser and the defendant, no error should be permitted to intervene. *People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41.

We have already decided that the evidence is not close factually, that defendant was not denied a fair trial, and that the plain-error doctrine is inapplicable. We also point out that additional evidence going beyond the defendant's testimony and the testimony of the girl was introduced below on the matter of guilt or innocence. Contrary to the defendant's belief, this additional evidence was relied upon by the jury to either substantiate or refute the respective stories; the jury did not make a determination based solely upon the testimony of Angela White and the defendant. We therefore hold that the defendant has failed to demonstrate any plain error sufficient to overcome the waiver doctrine.

## IV

■■ Finally, the defendant contends that Brenda White signaled to her daughter during the girls' testimony.

Several letters were written to the court by spectators at the trial complaining that Brenda had "coached" or signaled to Angela while the girl was on the stand. The letters stated that Brenda had nodded, shook her head, shrugged her shoulders, or otherwise made gestures while Angela testified. These allegations were raised in one of the defendant's post-trial motions, and testimony was introduced concerning the matter at a hearing held August 16, 1985.

Those 11 letters were introduced as evidence before the court during the August 16 hearing. Marge Sklenka, the bailiff in the courtroom during the trial, testified that she observed a black woman motioning toward Angela while the girl was on the witness stand. Sklenka then went to the woman and told her to refrain from making any further motions. Sklenka did not know for certain if the girl was actually looking at the woman at the time. However, Sklenka stated the motions or gestures would only be made after the girl would begin to answer a question. She further related she only saw the black woman making such gestures during cross-examination of the girl by defense counsel.

Roger Indermark, chief clerk of the circuit court of Sangamon County, assisted the judge during this trial and was present in the courtroom. He stated he was seated in an elevated position to the left of the judge where he could observe the witnesses as well as all spectators in the courtroom. Indermark testified that Angela kept her attention directed toward the attorneys questioning her, and did not

look to her mother while testifying.

Angela White testified that neither her mother nor anyone else told her how to answer the questions asked of her during the trial. She stated her mother did not signal what answers to give. Moreover, Angela stated she never actually saw her mother make any gestures. Also, Angela recounted that she looked directly at the lawyers the entire time. Angela reiterated that she had told the whole truth in this case.

Brenda White testified that she only made body movements after her daughter would begin to answer a question. She would "hunch" her shoulders or make slight movements in assent to Angela's responses. Although Brenda stated she was looking directly at Angela while she testified, Angela was not looking back at her. Also, Brenda admitted that even though a bailiff told her to stop making the motions, she continued to do so.

Upon reviewing the letters and testimony before it, the trial court found there had been no coaching of the witness. The court stated:

"In view of the—all of the testimony in this case, I do not believe that the testimony of Angela White was the testimony of someone else, her mother, nor that she was coached so that she was testifying to something on cue, rather than because [of] the truth or falsity. The Court was impressed with the testimony of Angela White, and with her demeanor on the stand, on direct examination as well as cross-examination."

The court further found Angela to be articulate and possessing the requisite testimonial qualifications in light of her age.

We see no reason to conclude, as the defendant advances, that the trial judge failed to maintain proper decorum in the courtroom during the trial. The court held a hearing on this matter and clearly found, based upon the evidence and testimony, that no signaling occurred. We see no reason to disturb this holding. Indeed, we believe it is far more likely that Brenda White was merely reacting to the testimony of her nine-year-old daughter during an emotional period while the girl was on the witness stand.

Based upon consideration of all the matters presented before us, we conclude that the jury properly found the defendant guilty of murder, and we find no reversible error.

Affirmed.

WEBBER and SPITZ, JJ., concur.