THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* NATHAN SEABERRY, JR., Defendant-Appellant.

Second District   No. 77-281

Opinion filed August 30, 1978.

Mary Robinson and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Dennis Ryan, State's Attorney, of Waukegan (Phyllis J. Perko and Martin P. Moltz, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

Defendant appeals from his conviction of murder following a jury trial and his sentence to a term of from 60 to 100 years' imprisonment.

It is not disputed that the victim Debbie Knox died as a result of knife wounds inflicted by the defendant. The defense, however, sought to convince the jury that the defendant lacked the necessary mental state to commit murder and also that defendant's conduct was impelled by sudden and intense passion from which the jury could have found that the offense was reduced to voluntary manslaughter. Defendant contends the failure to instruct the jury on the issue of voluntary manslaughter was prejudicial error and that, overall, he did not receive a fair trial because of the introduction of photographs which he characterizes as "grisly" and vials of the victim's blood. He claims that the error was exacerbated by inflammatory references to the prejudicial evidence in the arguments of the prosecutor. He also contends that the sentence is excessive.

It appears from the State's evidence that the defendant and Debbie Knox had shared a relationship over a period of five years prior to the homicide which occurred on October 2, 1976, during which the victim, who was 18 years old at the time of her death, had delivered two children both of whom had been placed in foster homes. Twelve days before the killing Miss Knox had moved into the apartment of Ruth Covington. Mrs. Covington testified that the defendant came to visit the decedent at the apartment every day. On the night of September 29, Mrs. Covington heard the defendant and the decedent arguing in loud tones in the decedent's bedroom; and although she walked into the bedroom and asked the couple not to be so loud they continued to argue in her presence. She said that the defendant stated that he wanted to continue the relationship, retrieve their two children from the foster homes and live as a family unit; but that the decedent stated that they both hated each other and it would be best that she went her way until "we both get our heads together." The defendant said he did not want it this way. Mrs. Covington also testified that the next day defendant informed her that he had taken her binoculars and had clandestinely observed her and the decedent at the decedent's mother's residence the night before. On October 1 the defendant came to the apartment seeking the decedent who was not there. Another of the State's witnesses testified that the defendant had told him that the decedent had explained her absence from her apartment that evening as having gone out with "some prostitute" and that when defendant saw her the next time "she had hickies all over her neck," and that's why he got mad.

Mrs. Covington testified that she next saw the decedent about 2 p.m. in the afternoon of October 2 when Debbie Knox came to the apartment and informed her that she was leaving and had come to gather her belongings and then left. The evidence showed that the decedent then returned to the apartment of her mother and stepfather; that about 8 o'clock on the evening of October 2 decedent left her mother's apartment to

place some laundry in her car and as she was returning to the apartment was accosted by the defendant. There was testimony that voices were heard outside that sounded as if the persons were involved in an argument with voices raised and not friendly in tone; that the argument continued for as long as three minutes when the sound of screams was heard; and that someone said "No" and then there was the sound of things falling on the sidewalk. There was further evidence that the decedent was seen running from the side of the building into the apartment of her mother and stepfather; that her stepfather saw blood gushing from her mouth and heard her say, "take me to the hospital; I'm going to die; I know it; I don't want to die." The stepfather testified that he asked her if "Nathan" had done this to her and that she nodded affirmatively. When the paramedics arrived the decedent was unconscious and could not be revived.

The pathologist testified that upon external examination of the decedent he found an incised wound of the upper and lower lips and of the left shoulder as well as contusions on the neck which were consistent with "kiss marks or hickies." Upon internal examination he found incised wounds of the tongue, lower lip and the floor of the mouth. The wounds extended as stab wounds into the neck which transected the left jugular vein and the left carotid artery causing the death.

The weapon used in the crime was recovered in a field. It was described as an 8-inch knife which was used in connection with automobile refinishing work at defendant's place of employment.

The defense sought to call a police officer who had taken a statement from the defendant, not introduced at trial, which the defense claimed would have supported defendant's theory that he lacked the requisite intent for murder. Upon objection of the State that the testimony was self-serving and hearsay the testimony was not permitted. The defense presented no further witnesses.

We first conclude that the trial court did not err in refusing to submit an instruction to the jury defining voluntary manslaughter. A person commits voluntary manslaughter where at the time of the slaying he acts under the influence of a "sudden and intense passion" resulting from "serious provocation," which is "conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1977, ch. 38, par. 9—2(a).) Where the issue is properly raised in a murder trial the burden is upon the State to prove beyond a reasonable doubt that the defendant did not act in a "heat of passion." (*Mullaney v. Wilbur*, 421 U.S. 684, 703, 44 L. Ed. 2d 508, 522, 95 S. Ct. 1881, 1892 (1975).) Nothing in the *Mullaney* opinion was intended to affect a State rule, such as that in Illinois, which places the initial burden of going forward with "some evidence" upon the defendant who seeks to assert the voluntary manslaughter defense. 421 U.S. 684, 701

n. 28, 44 L. Ed. 2d 508, 521 n. 28, 95 S. Ct. 1881, 1891 n. 28; see, *e.g.,* *People v. Simpson,* 57 Ill. App. 3d 442, 445-46 (1978); see also *People v. Bailey,* 56 Ill. App. 2d 261, 274 (1965).

■■ ■ The only category of "serious provocation" which could even arguably be present under the circumstances of this case would be that the decedent and the defendant were engaged in "mutual quarrel or combat." (See *People v. Crews,* 38 Ill. 2d 331, 335 (1967).) Under the circumstances of this case we cannot say that there was even "some evidence" of "serious provocation." At best the evidence shows that voices indicating the parties were engaged in an argument preceding for as long as three minutes the screams of Debbie Knox upon her attack. This is far short of evidence of "mutual quarrel or combat" as used in the context of homicide. (See *People v. Matthews,* 21 Ill. App. 3d 249, 253 (1974). See also Ill. Ann. Stat., ch. 38, par. 9—2, Committee Comments, at 207 (Smith-Hurd 1972).) The fact that the decedent was attempting to break off her relationship with defendant, as well as any words she might have used including her supposed revelation to the defendant that she engaged in any relationship with someone else would, of course, not constitute serious provocation within the contemplation of section 9—2 of the Criminal Code. (See *People v. Arnold,* 17 Ill. App. 3d 1043, 1047 (1974).) We find the cases cited by the defendant on this issue to be inapposite on their facts.

■■ Under all the circumstances defendant was clearly shown to have the requisite mental state to make his admitted killing murder and the proof of his guilt is clear beyond a reasonable doubt.

We also conclude that the defendant is not entitled to a new trial based either upon the introduction of evidence by the State or the comments of the prosecutor.

■■ Defendant objects to the admission of the color photographs which showed the victim's bloody body as it lay in the morgue, the blood on the floor and walls of the victim's mother's apartment, blood on the sidewalk outside the apartment and on her glasses and sweater, the showing of a trail of blood from the place of the stabbing toward the apartment; and photographs which showed the outside of the apartment building. While several of the photographs are of a gruesome nature the trial court was not required to reject them if they were relevant to establish any fact in issue. (See *People v. Henenberg,* 55 Ill. 2d 5, 13 (1973); *People v. Owens,* 65 Ill. 2d 83, 90 (1976). See also *People v. Dukett,* 56 Ill. 2d 432, 447 (1974).) Here, the photographs highlighted the viciousness of the attack and were probative of the fact that defendant must, at the very least, have known that his actions created a "strong probability" of "death or great bodily harm" to the victim (Ill. Rev. Stat. 1977, ch. 38, par. 9—1). It was necessary for the State to show this mental state beyond a reasonable doubt in

order to obtain a conviction of murder; and this was particularly true because the defendant presented the defense that he lacked the necessary mental state to constitute murder. In the aggregate the photographs tended to show the cause of death as explanatory of the testimony of the pathologist, and to show the identity of the victim. They were also illustrative of the testimony of the witnesses as to what transpired after the attack and before the death. Viewing the whole record it may have been unnecessary to introduce this evidence in view of the other proof. But we cannot state that the prosecution was barred from so proving its entire case even though the defendant admitted the killing since he denied that he possessed the mental state necessary for murder. Ill. Rev. Stat. 1977, ch. 38, par. 9—1.

■■ We think, however, that it was improper to admit the vials of the decedent's blood. The essential purpose of the offer was to connect the blood found at the scene to the blood found on the clothing of the victim, on the defendant and on the weapon used in the killing. While the evidence could arguably be explanatory of the investigation made by the police officers and explanatory of their testimony we cannot say that it was probative of any material issue in the trial and therefore it should not have been admitted. (See *People v. Elwell*, 48 Ill. App. 3d 628, 631 (1977).) But contrary to the facts in *Elwell* there was no objection here to the evidence at trial and, in fact, the defense counsel stipulated to the chain of custody of the evidence. (See *People v. Dukett*, 56 Ill. 2d 432, 448 (1974).) And the question was not raised in defendant's post-trial motion which ordinarily would constitute a waiver. (See *People v. Pickett*, 54 Ill. 2d 280, 282 (1973).) Under the circumstances of this case the waiver rule in our opinion should not be relaxed. We do not consider that the error involves substantial rights in view of the strong and conclusive evidence against defendant. The average juror could not on this record have found the State's case against Seaberry to be "significantly less persuasive" absent the introduction of the vials, and thus the error would be harmless beyond a reasonable doubt. (See *Schneble v. Florida*, 405 U.S. 427, 432, 31 L. Ed. 2d 340, 345, 92 S. Ct. 1056, 1059-60 (1972). See also *People v. Henenberg*, 37 Ill. App. 3d 464, 469 (1976).) Thus, we do not consider the error to be "plain error" which we might otherwise consider in relaxation of the rule of waiver under Supreme Court Rule 615(a). Ill. Rev. Stat. 1975, ch. 110A, par. 615(a).

We have also reviewed the argument of the state's attorney which the defendant claims to be reversible error and find that it was based upon the evidence and relevant to the theory of the State that defendant must have known that his actions created a strong probability of great bodily injury to the decedent. (Ill. Rev. Stat. 1975, ch. 38, par. 9—1.) Moreover,

the argument was not objected to and did not in any event amount to "plain error" under Supreme Court Rule 615(a).

■■ Reviewing the sentence to determine whether the trial court followed the constitutional and statutory guidelines (see Ill. Const., art. 1, §11; Ill. Rev. Stat. 1977, ch. 38, pars. 1001—1—2, 1005—4—1, 1005—6—1) we find no abuse of sentencing discretion. (See *People v. Perruquet*, 68 Ill. 2d 149, 156 (1977).) Even though the defendant had no prior criminal record the sentence of 60 to 100 years for the brutal murder of an 18-year-old girl hardly seems excessive. See, *e.g., People v. Dees*, 46 Ill. App. 3d 1010, 1027-28 (1977). See also *People v. Sprinkle*, 56 Ill. 2d 257, 264 (1974). *Cf.* Ill. Rev. Stat. 1977 Supp., ch. 38, par. 1005—8—1, amended effective February 1, 1978.

For the reasons stated the judgment of the trial court is affirmed.

Affirmed.

GUILD and WOODWARD, JJ., concur.