THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MAURICE CHEVALIER, Defendant-Appellant.

Second District   No. 2—85—0939

Opinion filed April 8, 1988.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Daniel D. Yuhas and Jane Raley, both of State Appellate Defender's Office, of Springfield, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers, Robert J. Biderman, and Linda Cullom, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE LINDBERG delivered the opinion of the court:

Defendant, Maurice Chevalier, was charged with murdering his wife, Shirley Chevalier, in a two-count indictment returned in the circuit court of Du Page County. A jury found him guilty of murder, and he was subsequently sentenced to a 40-year term of imprisonment. Defendant has appealed from this conviction.

Defendant raises six issues on appeal. He argues that: (1) his con-. viction should be reduced from murder to voluntary manslaughter because the State failed to prove beyond a reasonable doubt that he was not acting under a sudden and intense passion resulting from provocation by his wife; (2) he should receive a new trial because the trial court erred in refusing to admit psychiatric testimony on the question of whether he had acted under a sudden and intense passion as a result of provocation by his wife; (3) he should receive a new trial because the jury was not instructed that in order to find him guilty of murder it had to be established beyond a reasonable doubt that he was not acting under a sudden and intense passion resulting from serious provocation by his wife; (4) he should receive a new trial because "the prosecutor in his rebuttal closing argument ridiculed the defendant for claiming that *** he acted in the heat of passion as a result of provocation by his wife"; (5) he should receive a new sentencing hearing because the court improperly considered as an aggravating factor that he contemplated his criminal conduct would cause serious physical harm to the victim; and (6) his sentence should be reduced because the court abused its discretion in sentencing him to a 40-year term of imprisonment. Our view of this case makes it necessary to consider only the first three issues. We reverse and remand for a new trial

based upon the third issue raised.

It is undisputed that Shirley Chevalier arrived at home sometime after 8 p.m. on Friday, June 8, 1984. Not long thereafter, while they were in the bedroom, defendant killed her with a single bullet to her head from his .357 magnum revolver. Defendant then attempted to coverup the killing. He put Shirley's body in the trunk of his car and cleaned up the bedroom. He took her car to her place of employment and parked it in the parking lot there. He later drove to Michigan where he knew the weeds along the highway were high (and may have known that they were only cut once a year) and left Shirley's body in the weeds. Defendant lied several times over the course of two or three days regarding his knowledge of her whereabouts. Finally, on Monday, June 11, 1984, under questioning by a detective, defendant confessed to having killed his wife and indicated on a map where he had left the body. Late June 11, 1984, Shirley's body was found very near to where defendant indicated he had left it.

There was no question in the trial court that defendant killed his wife and that the killing was without lawful justification. The dispute at trial was whether defendant had committed a murder or a voluntary manslaughter. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1, 9—2.) Specifically, defendant claimed and the State denied that he had been "acting under a sudden and intense passion resulting from serious provocation by" Shirley at the time of the killing. Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)(1).

Most of the evidence on this question came from the testimony of defendant, with other evidence either tending to corroborate or conflict with that testimony. Defendant testified that he left his first wife and Shirley left her third husband to marry each other. Shirley, all of whose prior marriages had ended in divorce, and defendant began to have marital difficulties a year after they were married. Over the course of 18 months, Shirley left defendant three times to live with defendant's best friend, Mel Patterson. Defendant was distraught in the periods when she was away from him and was the one who initiated the reconciliations that followed each period of separation. Two of defendant's adult children, Sherry Klupta and Maurice, Jr., corroborated defendant on this point, testifying to how upset he was in the periods of separation and how much happier he was after the reconciliations. Also, Cora Marmo, a psychotherapist, testified that she had counselled defendant and Shirley during one of these separations in 1981 and that defendant was "very intent on wanting to reconcile with" Shirley and "very much wanted to get back with her and reconcile their differences."

In May 1984 Shirley started coming home late from work. This was corroborated by testimony from James Kuta, a co-worker of Shirley's, who testified that it was about that time he and Shirley started meeting for drinks after work. Kuta, who was married, admitted to having kissed Shirley but denied having sexual intercourse with her or being interested in her romantically.

Defendant testified that on June 6, 1984, the Wednesday before the shooting, he called Shirley at about 2:30 p.m. at work but was told she was not there. That night defendant and Shirley argued after defendant confronted her with not having been at work. Later that night, defendant told her he "was going to divorce her if she kept this up." They reconciled before retiring that night and slept in the same bed. The next night, defendant discovered a brown paper bag containing a pair of soiled panties belonging to Shirley in her car. He did not say anything to her about the panties that night but rather reminded her of a meeting with defendant's ex-wife at 7 p.m. to discuss his daughter Sherry's impending wedding.

On June 8, 1984, defendant arrived home at about 3:30 p.m. Greg Martin, one of Shirley's sons with whom defendant did not get along, was living with them. Greg, who worked at the same place as Shirley, arrived home at about 4:45 p.m. Defendant asked Greg where Shirley was. Defendant testified Greg said he did not know, and Greg testified he said she "went out with a couple of girls from work in her department." Both agreed that defendant then said something close to, "This shit is going to have to stop" and then left the house. Greg testified that defendant left at about 6 p.m., and, while he was gone, Greg noticed that the .357 magnum revolver was missing from its customary place under defendant's mattress. Defendant testified that on June 8, 1984, he had moved the gun to the drawer of the nightstand, where Greg did not look, because the cleaning lady was scheduled to change the linens that day. Defendant returned at about 7 p.m., and Greg testified that when he looked again the gun was under the mattress. Later, during the investigation of Shirley's disappearance, Greg told defendant he was going to tell the police about this, and defendant asked him not to say anything about the missing gun.

Defendant testified that, after he had returned from the bar, he had called his ex-wife at about 7 p.m. to cancel the meeting. Another of Shirley's sons, David Ransom, testified that he arrived at about 7:30 p.m. Defendant told him that Shirley had gone out again, that David had better find a new place to live, and that he was not going to take this "shit" anymore. David left at about 8 p.m. Defendant testified that he drank steadily from 3:30 p.m. to 8 p.m.

Shirley arrived shortly after 8 p.m. Defendant testified:

"Q. Calling your attention, Mr. Chevalier, to the conversation in the kitchen, what did you first say to your wife?

A. I asked her where she had been.

Q. What did she respond?

\* \* \*

A. I asked her—I said didn't you know we was supposed to meet my ex-wife?

Q. And what did she say?

\* \* \*

A. She had better things to do with her time.

Q. What next did you say?

A. I said are you messing around again?

Q. What did she respond to that?

A. She said no.

\* \* \*

Q. What did you say to her?

A. I said I know you are messing around again.

Q. What did she answer to that?

A. She started calling me names.

\* \* \*

Q. What names did she call you?

A. Called me no good dirty bastard."

They both went into the bedroom, where the argument continued.

"Q. What did you say?

A. I says I know you are messing around, who are you messing around with now, Mel Patterson?

Q. Did she answer that question?

A. No, sir.

Q. Did you say anything else to her?

A. Yes, sir, I asked her—I kept asking her the same thing.

Q. Well, you will have to tell the jury what you said.

A. I asked her, I said I know you are messing around because you are coming home late again.

Q. And what did she respond to that?

A. She says yes, she is doing it, she is going to keep on doing it.

\* \* \*

Q. What did you say to her then?

A. I said I know you are messing around.

Q. Did she answer?

A. Yes, sir.

Q. What did she say?

A. She called me a no good bastard and she said I'm no fucking good in bed and all.

Q. And you said and all, did she say something else?

A. Yes, sir, she said she was going to continue seeing—

* * *

Q. Did you say anything else then?

A. No, sir.

Q. Did she say anything else?

A. She was cussing me more.

Q. Well—

A. I mean, just calling me bastard and names.

* * *

Q. [A]fter she said these things, did you say anything else to her?

A. I just told her when I found the panties in the car Thursday night, I know it is true.

Q. Did she answer that?

A. She answered that she was doing—messing around.

Q. All right. Was there any further conversation at that time?

A. I can't remember anything other than that.

Q. What is the next thing that you do remember?

A. I remember her laying [sic] on the floor.

Q. And where were you when you remember her laying [sic] on the floor?

A. I was standing in the bedroom by her feet.

Q. What did you do then?

A. I got down on my hands and knees and held her in my arms."

Defendant held her for 10 or 15 minutes during which time she was not moving. After that time, he began the attempt to cover up the killing by carrying her body to the trunk of his car. Defendant testified to behavior in the period after the shooting from which it could be inferred that he was very upset. This was partially corroborated by Maurice, Jr.'s, testimony that he saw his father at about 9:30 p.m. that night. Defendant was then extremely quiet and withdrawn, telling Maurice, Jr., that Shirley was still not home. Maurice, Jr., talked to his father for an hour trying to cheer him up and then left.

Defendant first contends that the evidence was insufficient to prove his guilt of murder beyond a reasonable doubt because it was insufficient to prove beyond a reasonable doubt that, at the time of

the killing, defendant was not acting under a sudden and intense passion resulting from serious provocation by Shirley. Two questions must be considered before we can determine whether the evidence was sufficient to convict defendant of murder. First, we must decide whether the provocation claimed by defendant was legally adequate to reduce the homicide to voluntary manslaughter. Second, we must decide whether the State had the burden of proving beyond a reasonable doubt that, at the time of the killing, defendant was not acting under a sudden and intense passion resulting from serious provocation by Shirley in order to obtain a murder conviction.

The State contends that the provocation claimed was not legally sufficient to reduce the homicide to voluntary manslaughter. If true, this would mean not only that the evidence was sufficient to convict defendant of murder, but also that defendant could not prevail on any of the other three trial issues raised. This is because none of them could be prejudicial inasmuch as the only prejudice claimed to have resulted from them is the possibility that defendant might have been convicted of voluntary manslaughter rather than murder if the alleged errors had not occurred.

The voluntary manslaughter statute provides:

"Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)(2).)

In the case at bar, we believe that defendant's testimony was some evidence of a legally adequate provocation under this statute.

■■ ■ Our opinion in *People v. Ambro* (1987), 153 Ill. App. 3d 1, 505 N.E.2d 381, sets forth the law governing this question.[1] The verbal communication by a spouse of the fact of adultery is not, without more, sufficient to constitute a serious provocation in Illinois. (*People v. Ambro* (1987), 153 Ill. App. 3d 1, 6, 505 N.E.2d 381, 384.) Where, however, "the revelation of adultery was one of a series of provoking statements or circumstances," there may be a legally adequate provo-

---

[1]The author of this opinion dissented from this portion of *Ambro*. (*People v. Ambro* (1987), 153 Ill. App. 3d 1, 8, 505 N.E.2d 381, 386 (Lindberg, P.J., concurring in part and dissenting in part), *appeal denied* (1987), 115 Ill. 2d 543, 511 N.E.2d 431.) Having made his argument and having failed to prevail, the author now feels bound by *stare decisis* to follow the majority opinion in *Ambro*. See *People v. Albanese* (1984), 104 Ill. 2d 504, 542-49, 473 N.E.2d 1246, 1263-66 (Ryan, C.J., and Clark, J., specially concurring), *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061; *People v. Lewis* (1981), 88 Ill. 2d 129, 165-71, 430 N.E.2d 1346, 1363-66 (Goldenhersh, C.J., and Ryan and Clark, JJ., concurring), *cert. denied* (1982), 456 U.S. 1011, 73 L. Ed. 2d 1308, 102 S. Ct. 2307.

cation. (*People v. Ambro* (1987), 153 Ill. App. 3d 1, 6, 505 N.E.2d 381, 384.) For example, there was serious provocation where:

"In both [*People v. Ahlberg* (1973), 13 Ill. App. 3d 1038, 301 N.E.2d 608, and *People v. Carr* (1980), 91 Ill. App. 3d 512, 414 N.E.2d 1108, *cert. denied* (1981), 454 U.S. 848, 70 L. Ed. 2d 136, 102 S. Ct. 167], there was a history of ongoing marital discord, a wife who evidenced an intent to permanently leave her husband, insulting remarks concerning the husband's masculinity and an announcement of adultery by the wife." (*People v. Ambro* (1987), 153 Ill. App. 3d 1, 6, 505 N.E.2d 381, 384.)

Similarly, this court held that there was serious provocation in *Ambro* where:

"[D]efendant and his wife had been experiencing marital difficulties for seven years and, as in *Carr*, defendant began to suspect her of infidelity shortly before he killed her. One week before her death, Ruth [the wife] told the couple's marital-counselling group and defendant that she no longer loved her husband and was going to seek a divorce. She then contacted an attorney to draft a petition for dissolution of the marriage and informed defendant of her actions. On the evening of the killing, defendant became upset over his wife's treatment of Bethany [their daughter] and her threats of seeking a divorce, and the couple engaged in repeated arguments during which the wife implied that defendant was not the father of her children, called him an alcoholic, and told him she was going to take the children when she left him. When defendant knelt beside his wife and asked how he could restore their relationship, she informed him of her adultery and then goaded him to kill her." (*People v. Ambro* (1987), 153 Ill. App. 3d 1, 6, 505 N.E.2d 381, 384.)

The testimony of defendant in the case at bar, tending to prove facts similar to those in *Ambro*, was some evidence of a legally adequate serious provocation.

In the case at bar, the parties had experienced marital difficulties for several years. Shirley, who was divorced three times, had left her third husband to marry defendant and had since left defendant three times to live with Mel Patterson. On at least one of the occasions when she left defendant to live with Mel Patterson, Shirley had moved out without previously announcing her intention to do so. Thus, while she did not announce her intention to leave defendant near the time of the killing, Shirley's past actions permit the inference that defendant could reasonably have feared that she was going

to leave him. Also, in the weeks just prior to the killing, Shirley was staying out later than usual, and the day before the killing defendant had found soiled panties belonging to her in her car. Finally, during the argument that ended in the shooting, Shirley called him various names, said he was "no fucking good in bed," admitted she was committing adultery, and told defendant she would continue committing adultery. This was evidence of a legally adequate provocation. See *People v. Ambro* (1987), 153 Ill. App. 3d 1, 505 N.E.2d 381.

The next question we must consider is whether, to sustain defendant's murder conviction, the evidence must have been sufficient to prove beyond a reasonable doubt that, at the time of the killing, defendant was not acting under a sudden and intense passion resulting from serious provocation by Shirley. Defendant's argument on the first issue assumes that this was necessary, and the State's argument on that issue ignores the question. However, in their arguments on the third issue, relative to jury instructions, the parties have both addressed this question. Because we believe that this question should be decided before addressing the sufficiency of the evidence to convict defendant of murder, we will consider the question, and the relevant portions of the parties' arguments on the third issue, at this time.

■ We follow those cases that hold that, where voluntary manslaughter is properly an issue, a murder conviction is proper only if the evidence is sufficient to prove beyond a reasonable doubt the absence of the element which would reduce the homicide from murder to voluntary manslaughter. (*E.g., People v. Bushman* (1986), 144 Ill. App. 3d 1022, 1026, 495 N.E.2d 119, 122; *People v. Williams* (1985), 134 Ill. App. 3d 334, 338-39, 480 N.E.2d 205, 208-09; *People v. Bolden* (1985), 132 Ill. App. 3d 1047, 1058, 477 N.E.2d 1380, 1387.) This standard is similar to the evidentiary requirements of cases in which most affirmative defenses are raised. In those cases, the State must prove beyond a reasonable doubt that the defense does not apply. Ill. Rev. Stat. 1985, ch. 38, par. 3—2(b); *e.g., People v. Greene* (1987), 160 Ill. App. 3d 1089, 1096, 513 N.E.2d 1092, 1096 ("Once the issue is raised, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. [Citations.] *** If the trier of fact has determined that the State has negated beyond a reasonable doubt any one of the elements justifying the use of force, then the State has carried its burden of proof. [Citations.]").

The State argues:

"[D]efendant's argument is based on a series of Fourth District Appellate Court cases, the holdings of which have not been adopted by this court and which create a potential constitu-

tional challenge to the voluntary manslaughter statute and are inconsistent with established precedent in the fourth district and a recent supreme court opinion.

\* \* \*

[T]his court has never adopted the holding in *People v. Bolden*, 132 Ill. App. 3d 1047, 87 Ill. Dec. 852, 477 N.E.2d 1380 (4th Dist. 1985), and *People v. Williams*, 134 Ill. App. 3d 334, 89 Ill. Dec. 519, 480 N.E.2d 105 (4th Dist. 1985), and, in fact, this court in *People v. McGee*, 110 Ill. App. 3d 766, 66 Ill. Dec. 894, 443 N.E.2d 1057 (2nd Dist. 1982), stated that the trial court is not required to instruct the jury that the State must negate the elements of voluntary manslaughter beyond a reasonable doubt before a jury can convict someone of murder. See also *People v. March*, 95 Ill. App. 3d 46, 50 Ill. Dec. 763, 419 N.E.2d 1212 (2nd [*sic*] Dist. 1981)."

Although couched in terms of jury instructions, it is apparent that the basic contentions of the State are that the mental state of voluntary manslaughter need not be negated beyond a reasonable doubt to convict a defendant of murder and that the *Bolden* line of cases holding to the contrary is incorrect.

The State's argument seems to imply that the Appellate Court for the Fourth District stands alone in its adherence to *Bolden*. This is incorrect, as the Appellate Court for the Third District has followed *Bolden*. (*People v. Clark* (1988), 165 Ill. App. 3d 210, 215, 518 N.E.2d 763, 766-67.) Also, the implication of the State's argument to the contrary notwithstanding, this district has followed the central holding of *Bolden*, stating that "[w]here the defendant presents some evidence [of the mental state for voluntary manslaughter], the burden is on the State to prove beyond a reasonable doubt that he did not have [that mental state] in order to obtain a conviction of murder." *People v. Denson* (1985), 139 Ill. App. 3d 914, 924, 487 N.E.2d 777, 783-84, citing *People v. Bolden* (1985), 132 Ill. App. 3d 1047, 477 N.E.2d 1380.

Our case of *People v. McGee* (1982), 110 Ill. App. 3d 766, 443 N.E.2d 1057, followed the Fourth District's case of *People v. March* (1981), 95 Ill. App. 3d 46, 419 N.E.2d 1212. However, the Fourth District explicitly departed from *March* in *Bolden* (*People v. Bolden* (1985), 132 Ill. App. 3d 1047, 1058, 477 N.E.2d 1380, 1387), thus undermining the basis of *McGee*. We are persuaded that *Bolden*, and the cases which have followed *Bolden*, are correct on this issue, and so we will follow that line of cases, including our own *Denson* case.

Any implication in the State's argument to the contrary notwithstanding, the decision in *Bolden* had antecedents in the case law of

this State. For example, this court in a pre-*Bolden* case held:

> "Where the issue is properly raised in a murder trial the burden is upon the State to prove beyond a reasonable doubt that the defendant did not act in a 'heat of passion.' " (*People v. Seaberry* (1978), 63 Ill. App. 3d 718, 721, 380 N.E.2d 511, 514.)

(See also *Mullaney v. Wilbur* (1975), 421 U.S. 684, 704, 44 L. Ed. 2d 508, 522, 95 S. Ct. 1881, 1892 ("We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case"); *cf. Patterson v. New York* (1977), 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319.) Moreover, in another pre-*Bolden* case, the court discussed the relationship between voluntary manslaughter and murder as follows:

> "The difference between murder and manslaughter is the absence of malice or intent to kill as a necessary element of manslaughter. [Citations.] The crime of manslaughter is embraced in a charge of murder, and where homicide is proved but proof of the requisite malice is lacking, a conviction for manslaughter is proper. [Citation.] Thus, defendant's argument that the jury, after finding him guilty of murder, was prevented from finding the additional element necessary to reduce defendant's offense to manslaughter is without merit, since finding an additional element is not the manner in which a homicide is found to be manslaughter rather than murder." *People v. Barney* (1982), 111 Ill. App. 3d 669, 675-76, 444 N.E.2d 518, 523.

See also *People v. Scott* (1970), 123 Ill. App. 2d 107, 114, 259 N.E.2d 594, 597 ("The difference between murder and manslaughter is the absence of malice as an element of the crime in the latter offense"); *People v. Wiggins* (1957), 12 Ill. 2d 418, 426, 147 N.E.2d 80, 84 ("[W]here a homicide is proved, but proof of the requisite element of malice is lacking, a conviction for manslaughter is proper").

The State is incorrect in claiming that *Bolden* is inconsistent with a recent Illinois Supreme Court case. The case the State cites did not deal with whether the absence of the mental state for voluntary manslaughter must be proved beyond a reasonable doubt to convict defendant of murder, and it is not otherwise inconsistent with the *Bolden* line of cases. *People v. Wright* (1986), 111 Ill. 2d 18, 488 N.E.2d 973.

Finally, the State claims that requiring proof beyond a reasonable doubt negating the mental state of voluntary manslaughter to convict of murder, and permitting conviction of voluntary manslaughter if that mental state is not sufficiently negated, "create[s] a potential

constitutional challenge to the voluntary manslaughter statute." Since we do not have such a challenge before us we need not determine whether one might be brought, and we express no opinion on whether one would be successful. We wish to note specially that, insofar as it addresses the questions the State raises in the case at bar, we agree with *People v. Williams* (1985), 134 Ill. App. 3d 334, 480 N.E.2d 205.

We find the *Bolden* line of cases to be persuasive, to be well reasoned, and to state correctly the law of this State regarding the necessity of proving beyond a reasonable doubt the absence of the mental state for voluntary manslaughter to obtain a conviction for murder. We therefore will follow those cases.

■ We now consider whether the evidence was sufficient to prove defendant's guilt of murder beyond a reasonable doubt. We conclude that it was sufficient.

Defendant's basic claim is that the evidence was insufficient to prove beyond a reasonable doubt that, at the time of the killing, he was not acting under a sudden and intense passion resulting from serious provocation by Shirley. The evidence established that defendant knew that Shirley had been divorced three times and that she had left her third husband to marry him. She had, moreover, left him to live with another man on three occasions. This evidence in particular, taken with all of the other evidence and the jury's opportunity to observe defendant's demeanor on the witness stand, would permit the jury to infer that defendant was to a large degree accustomed to the thought of Shirley having intercourse with other men and to the knowledge of Shirley's commission of adultery during their marriage. Based upon this, the jury could have concluded beyond a reasonable doubt that defendant had not experienced a sudden and intense passion at the time he killed Shirley, and so that he was guilty of murder. Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a), 9—2(a).

■■ ■ We consider next the third issue raised by defendant on appeal. Defendant contends that he was denied a fair trial because the jury was not instructed that, in order to find him guilty of murder, the State had to prove beyond a reasonable doubt that, at the time of the killing, defendant was not acting under a sudden and intense passion resulting from serious provocation by Shirley. Since we have already decided that the State was required to prove this element, it follows that the jury should have been so instructed. (*People v. Bolden* (1985), 132 Ill. App. 3d 1047, 477 N.E.2d 1380.) The jury instructions at bar did not do so and were, accordingly, erroneous. However, defendant never raised this issue in the trial court. We must, therefore, determine whether plain error, ineffective assistance of counsel,

or some other exception to the waiver rule applies in order to determine whether the error committed requires reversal.

Supreme Court Rule 451(c) provides that "substantial defects [in jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require." (107 Ill. 2d R. 451(c).) Our supreme court has said:

> "[T]he plain-error exception to the waiver rule created by Rule 451(c) [citation] is to be confined to the correction of 'grave errors' [citations] or to instances where the case is so close factually that fundamental fairness requires the jury be properly instructed. [Citations.]" (*People v. Berry* (1984), 99 Ill. 2d 499, 505, 460 N.E.2d 742, 744.)

In the case at bar, "there was 'grave error' as well as circumstances that were so close factually as to require the tendering of proper jury instructions." *People v. Berry* (1984), 99 Ill. 2d 499, 505, 460 N.E.2d 742, 744.

In addition to instructions defining murder and voluntary manslaughter (Illinois Pattern Jury Instructions, Criminal, Nos. 7.01, 7.03 (2d ed. 1981)), the jury was given the following issues instructions:

> "To sustain the charge of murder, the State must prove the following propositions:
>
> FIRST: That the defendant performed the acts which caused the death of Shirley Chevalier.
>
> SECOND: That when the defendant did so, he intended to kill or do great bodily harm to Shirley Chevalier or he knew that his acts created a strong probability of death or great bodily harm to Shirley Chevalier.
>
> If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.
>
> If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty.
>
> * * *
>
> To sustain the charge of voluntary manslaughter, the State must prove the following propositions:
>
> First: That the Defendant performed the acts which caused the death of Shirley Chevalier; and
>
> Second: That when the Defendant did so, he intended to kill or do great bodily harm to Shirley Chevalier, or he knew that such acts created a strong probability of death or great bodily harm to Shirley Chevalier; and

Third: That when the Defendant did so, he acted under a sudden and intense passion resulting from serious provocation by another.

If you find from your consideration of all of the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the Defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the Defendant not guilty." (Illinois Pattern Jury Instructions, Criminal, Nos. 7.02, 7.04 (2d ed. 1981).)

The jury was given three verdict forms: (1) not guilty of murder and not guilty of voluntary manslaughter; (2) guilty of murder and not guilty of voluntary manslaughter; (3) not guilty of murder and guilty of voluntary manslaughter. None of the instructions informed the jury of which form to sign if it decided that all of the elements of both murder and voluntary manslaughter were proved beyond a reasonable doubt.

The grave error in these instructions is manifest. First, it is obvious that not only do the instructions omit from the murder issues instruction the requirement that the State negate the sudden-and-intense-passion mental state beyond a reasonable doubt to find defendant guilty of murder, but the voluntary manslaughter issues instruction compounds this error by requiring that the evidence prove beyond a reasonable doubt the presence of the sudden-and-intense-passion mental state. Thus, if the jury found the evidence insufficient to prove beyond a reasonable doubt either the presence or the absence of the mental state, but found the other elements were proved, the instructions would require the jury to find defendant guilty of murder and not guilty of voluntary manslaughter. This is exactly the opposite of the result required by the law. See *People v. Bolden* (1985), 132 Ill. App. 3d 1047, 477 N.E.2d 1380.

The error was further compounded by the giving of three forms of verdict without the giving of any instruction telling the jury what to do if it found all of the elements of both offenses proved beyond a reasonable doubt. Under the instructions given, if a jury was convinced beyond a reasonable doubt that all of the elements of voluntary manslaughter were established it would necessarily be convinced that all of the elements of murder were established. The jury would then be confronted with three forms of verdict, none of which were appropriate to its conclusion that both offenses had been proved beyond a reasonable doubt. Since the two forms containing guilty findings as to

one of the offenses would be more nearly correct than the form finding defendant not guilty of both offenses, it is likely that the jury would select one of those to return. However, with no instruction informing them that the only proper verdict in such a case would be not guilty of murder and guilty of voluntary manslaughter, there is no telling which of the forms they might select. After the fact, it is impossible to determine from the verdict form returned whether the jury actually believed defendant was guilty of murder and not guilty of voluntary manslaughter or believed defendant was guilty of both offenses, since the instructions did not give the jury that option.

This is not to say that it would not be proper to give the jury three forms of verdict in a case like that at bar. (See *People v. Hoffer* (1985), 106 Ill. 2d 186, 200, 478 N.E.2d 335, 342-43, *cert. denied* (1985), 474 U.S. 847, 88 L. Ed. 2d 114, 106 S. Ct. 139.) It is to say, rather, that such a set of verdict forms does not substitute for proper instruction on the mutually exclusive mental states of murder and voluntary manslaughter (see *People v. Hoffer* (1985), 106 Ill. 2d 186, 200, 478 N.E.2d 335, 342-43, *cert. denied* (1985), 474 U.S. 847, 88 L. Ed. 2d 114, 106 S. Ct. 139) and, in the absence of proper instruction on those mental states, may exacerbate rather than cure the instructional deficiencies.

The State has cited this court's opinion in *People v. Howard* (1985), 139 Ill. App. 3d 755, 487 N.E.2d 656, on the question of whether the error alleged was plain error. In *Howard*, the issue was whether "the jury should have been instructed that the burden was on the State to negate the elements which would lead to a verdict of voluntary manslaughter even though he did not object to jury instructions at trial." (*People v. Howard* (1985), 139 Ill. App. 3d 755, 761, 487 N.E.2d 656, 660.) The court said:

"[I]n the present case the jury returned a not-guilty verdict on the voluntary manslaughter charge and a guilty verdict on the murder charge, making it clear that they did not believe that defendant was acting under an intense passion at the time of the stabbing. Thus, we cannot say that the omission of the language now requested by defendant rises to the level of plain error. [Citations.]" (*People v. Howard* (1985), 139 Ill. App. 3d 755, 761, 487 N.E.2d 656, 661.)

There are two problems with the use of *Howard*. First, it is unclear whether the jury in *Howard* had the option of returning guilty verdicts for both murder and voluntary manslaughter. If it did, then the verdicts would be somewhat more interpretable than those in the case at bar. Second, and more fundamentally, the rationale of *Howard* is

flawed. A not guilty verdict on voluntary manslaughter, where the jury has been instructed as the jury at bar was instructed, does not mean that the jury did not believe the defendant was acting under a sudden and intense passion resulting from serious provocation by another. It means merely that the jury does not believe that the evidence established that proposition beyond a reasonable doubt. If the jury believed one of the mental states for voluntary manslaughter had been proved by clear and convincing evidence (or a preponderance of the evidence), or that it had been negated but had not been negated beyond a reasonable doubt, the instructions at bar would require the jury to find a defendant not guilty of voluntary manslaughter, and the *Howard* analysis would find no plain error. While Supreme Court Rule 451(c)'s plain error rule is of narrow application, we do not believe that it was intended to have this narrow an application. Thus, under the instructions and verdicts given to the jury, we cannot determine whether the jury, in failing to find defendant guilty of voluntary manslaughter, found that the State negated the provocation mental state beyond a reasonable doubt.·

In the case at bar, there was nothing in the closing arguments by either party to fill the instructional gap. (See *People v. Berry* (1984), 99 Ill. 2d 499, 505-06, 460 N.E.2d 742, 744-45.) Because of the nature of the error in the instructions at bar and the lack of any comments by the parties in closing arguments to fill the instructional gap, we conclude that grave error was committed.

■ We also find that, in the case at bar, there were "circumstances that were so close factually as to require the tendering of proper jury instructions." (*People v. Berry* (1984), 99 Ill. 2d 499, 505, 460 N.E.2d 742, 744.) We recited the evidence at some length at the beginning of this opinion and will not repeat it here. It suffices to say that the evidence was such that the jury could have found either way on whether, at the time of the killing, defendant had acted under a sudden and intense passion resulting from serious provocation by Shirley. This is precisely the sort of case where erring by not instructing the jury that murder requires proof beyond a reasonable doubt that, at the time of the killing, defendant was not acting under a sudden and intense passion resulting from serious provocation by Shirley could well have made the difference between defendant's being convicted of murder and his being convicted of voluntary manslaughter.

Thus, the error was a grave one cognizable under Supreme Court Rule 451(c) (107 Ill. 2d R. 451(c)). Also, the evidence on the issue the error concerned was closely balanced, and, for that reason too, the instructional error was plain error cognizable under Supreme Court

Rule 451(c) (107 Ill. 2d R. 451(c)). Accordingly, defendant's conviction for murder must be reversed and this cause remanded for a new trial. See *People v. Berry* (1984), 99 Ill. 2d 499, 460 N.E.2d 742.

■ We address defendant's second issue because it may arise again on remand. Defendant contends that the trial court erred in refusing to admit psychiatric testimony from Dr. Lyle Rossiter relevant to whether, at the time of the killing, defendant was acting under a sudden and intense passion as a result of provocation from Shirley. In *People v. Ambro* (1987), 153 Ill. App. 3d 1, 7-8, 505 N.E.2d 381, 385-86, we held that the rejection by the court of such testimony was not reversible error. We find *Ambro* controls this issue and hold that the trial court did not err in refusing to admit Dr. Rossiter's testimony.

The judgment of the circuit court of Du Page County is reversed and the cause remanded for a new trial.

Reversed and remanded.

HOPF and DUNN, JJ., concur.